real estate to be disposed of according to the terms of the will at the close of the trust period; but it is not regarded that the present question is within the bar of the adjudication cited. The judgment therein reached was solely that under the power of sale the contract for the conveyance of a certain piece of property was not enforceable, and it is impossible to derive from the judgment itself any declaration that the real estate could not be disposed of under the trust for the purposes of the business. There was not submitted to the Appellate Division the question whether or not, as a part of the trust, real or personal property was intended to be disposed of by sale or otherwise, if its proceeds were necessary, in the judgment of the executors, for the continuance of the business and the executors had determined in their wisdom to continue the same.

The former decree of the surrogate settling the accounts of the trustee, though it approved of an account in which the trustee reported the devotion of all the testator's property to the business and the investment in such business of the unexpended accumulation of income, cannot be a bar to the consideration of the construction of the will so far as it must necessarily bear upon the disposition of the assets presented by the present account. Though the former accounting may be regarded as conclusive upon the past transactions and payments covered in such accounting, it forms no bar to the proper decision of the question now presented as to the disposition of the property now in the hands of the trustee. Bowditch v. Ayrault, 138 N. Y. 222, 231, 33 N. E. 1067. See, upon the same point, Matter of Hoyt, 160 N. Y. 607, 55 N. E. 282, 48 L. R. A. 126; Matter of Hunt, 41 Misc Rep. 72, 74, 83 N. Y. Supp. 652; Frethey v. Durant, 24 App. Div. 58, 48 N. Y. Supp. 839.

The accounting should proceed in accordance with these views.
Decreed accordingly.

---

(59 Misc. Rep. 116.)

### In re GARNER'S ESTATE.

(Surrogate's Court, New York County. April, 1908.)

1. MARRIAGE—EVIDENCE TO ESTABLISH—SUFFICIENCY.
   A husband obtained a divorce from his wife, who was forbidden to marry during his lifetime. Without proof of his death, she lived with one who introduced her as his wife, stating that he had married her in New Jersey, and they were recognized as married by their friends and relatives. The relation continued until the death of the man 12 years thereafter. *Held,* that the marriage of the parties was sufficiently established.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, §§ 86, 87.]

2. WILLS—WHO MAY CONTEST.
   Where the children of a decedent were his sole heirs at law, his sister and brothers had no standing to contest the probate of his will.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 532.]

In the matter of the estate of Henry J. Garner. Objections of contestants to probate of will dismissed.

Gustave Frey, for petitioner.
Peter J. Everett, for contestant.
William H. Hamilton, special guardian.

BECKETT, S.　Decedent died October 31, 1907.　On December 2, 1907, the propounded paper was filed for probate.　It is dated October 16, 1907, and directs "my executors hereinafter named to pay my just debts and funeral expenses," but names no executors.　It provides:

"I give, devise and bequeath all my estate, both real and personal, to my dearly beloved wife, Elizabeth M. Garner, to have undisputed possession of the same.　To my lifetime friend, Owen Monks, I wish him to select whatever clothes he may wish, and in case the dog named Cinders is disposed of (sic) to be given back to him."

Elizabeth M. Garner applied November 11, 1907, for and obtained letters of administration on said estate, alleging that she was the widow, and that she had made diligent search and inquiry for a will and had not found any, or any information that decedent left any.　Thereafter, with this propounded paper, she caused to be filed her petition for its probate, in which she alleged that she had discovered it November 25, 1907.　In said petition she again alleged that she was the widow of the decedent, and also that his only heirs at law and next of kin were two infant sons and two infant daughters and two adopted daughters and one adopted son.　A special guardian was appointed for all of said infants, who appeared for them, but filed no objections. The only contestants are Jennie V. McCormack and John, Thomas, James, William H., and George H. Gernon, none of whom is alleged to be heirs at law or next of kin in said petition for probate.　It transpires that contestants were a sister and brothers of the deceased. No motion was made by any of the parties to amend the pleadings, and, if allegations have any weight in probate proceedings, it will be noted, at the outset, that contestants by their verified answers in no wise deny that proponent is the widow of the decedent.　Indeed, her allegation in that respect has not been in any wise traversed by contestants' answers, nor do said answers deny the allegations of the proponent that the infants are decedent's heirs at law and next of kin, nor do the contestants by said answers allege that they themselves are heirs at law and next of kin of the decedent.　The only thing in their answers which would lead any one to suppose that they made such claim are the mere words of description following the names of the pleaders at the beginning of their answers, e. g.:

"Jennie V. McCormack and William H. Gernon, two of the only heirs at law and next of kin of Henry J. Gernon, known as Harry J. Garner, deceased, appearing in this proceeding by Peter J. Everett, their attorney, object," etc.

The contestants were not cited in the proceeding. · No order was made by a surrogate permitting them to intervene.　The question of their status was not raised by any counsel at the opening of the contest. The surrogate himself first called attention to this anomalous condition, and as far as the pleadings go contestants are mere "interlopers," within the meaning of that word as used in Matter of Hamilton, 76 Hun, 200, 27 N. Y. Supp. 813, and, as far as presumptions

based upon pleadings may go, the same should be exercised in favor of said infants and against said contestants. This situation having been elicited on the trial, the hearing upon the main case was suspended, and counsel were directed to proceed on the question of status. Surr. Rules of Practice 4; Matter of Henry (Rollins, S.) 4 Dem. 255, 258; Matter of Hamilton (Ransom, S.) 12 N. Y. Supp. 708, affirmed 76 Hun, 200, 27 N. Y. Supp. 813; Matter of Rossignot (Fitzgerald, S.) Surr. Decs., 1905, p. 688.

The preponderance of evidence taken upon this question discloses that on the 12th day of September, 1895, in a certain action for divorce then pending in the Superior Court of this county, wherein one Harry Leake was plaintiff and proponent defendant, a decree was made by Hon. P. Henry Dugoo, J., proponent being in default, whereby it was adjudged that the marriage of said parties was dissolved, and proponent was prohibited from marrying again during the lifetime of plaintiff. No evidence was adduced before me that the plaintiff has died. On the contrary, there was some slight evidence to the effect that he was still alive. Decedent was a harnessmaker and had a shop on Broadway, between Fifty-Seventh and Fifty-Eighth streets. Proponent called Owen Monks, the "lifetime friend" of the propounded paper, who satisfactorily qualified as to competency as a witness by executing a general release of his legacies. Matter of Fitzgerald, 33 Misc. Rep. 325, 68 N. Y. Supp. 632. He testified that, calling at decedent's shop in the autumn of 1896, he there met decedent and proponent, and the former introduced to him the latter as his wife, and as the two men thereupon proceeded to the near-by Reisenweber's, at decedent's suggestion, for the purpose, as Monks says, of being "blown off," Monks asked decedent where he got married, and decedent said:

·"Over in Jersey. * * * He mentioned something in regard to religion—that he had to go to New Jersey in regard to religion."

No evidence was adduced as to the precise dates when decedent's and proponent's children were born, and nothing disclosed as to the adoption of the alleged "adopted" children. They are all infants, the former class all under 14 years of age. In the summer of 1902 proponent and decedent were at Berkeley, N. J., and she was running a hotel there known as the "Berkeley Arms." They held themselves out and were generally reputed there to be husband and wife. In the years 1905 and 1906, and for about 18 months, they resided at South Norwalk, Conn., and their youngest child was born there. During the rest of the period from 1896 to the time of decedent's death in ·1907, they appear to have resided in New York. While they lived at South Norwalk, Mr. and Mrs. Comellas visited them in the summer of 1906 for about two months; Mr. Comellas staying Saturday nights and Sundays, and his wife remaining there all the time. The Garners kept house in South Norwalk, employed servants, lived as man and wife, held themselves out as and were reputed to be such in that locality. Their living, eating, sleeping were all of that hue and character. They addressed each other as husband and wife, and they spoke to their children in the manner of a father and a mother. Mr. Com-

ellas is a real estate operator, and he was jointly interested with decedent in various real estate enterprises. Mrs. Comellas impressed me as a lady of refinement and character. She received proponent and decedent at her home in New York, went with them to entertainments in company with her husband, and they have stayed together at her house overnight. An action was instituted in the Municipal Court, borough of Brooklyn, Second district, by one William F. Barton against proponent and decedent, both of whom filed answers verified August 31, 1904. Decedent's answer, among other things, alleged that proponent was his wife, and that the business conducted at the Berkeley Arms Hotel at Berkeley N. J., in 1902, was a business conducted by his wife entirely in her own interests and as a separate and distinct estate. During the later years they resided at Ritter Place and Lyman Place, in the borough of the Bronx. All the testimony that was adduced showed that they there lived as man and wife, and there is some evidence that contestants themselves or some of them, and their family connections, visited them. Prior to and upon the date that the propounded paper purports to have been executed and for some short time after decedent's death, proponent was in England with some of the children. Contestant Jennie V. McCormack, upon proponent's return, accompanied her to her home. She was called as a witness by proponent and acknowledged that she wrote letters to proponent while she was abroad, and that she addressed the envelope "Mrs. H. J. Garner, 11 West View, Huyton Quarry, Nr. Liverpool, England," in which one of said letters was posted. The letter itself, dated October 8, 1907, among other things, says:

"Dear Lizzie: * * * We are all pleased to hear that you and the children are well. * * * We don't wonder that Tom (one of the children whose status she and the other contestants now question) is such a favorite, for he was the same at home. * * * Jennie (another infant similarly situated) is holding her own when she got so many teeth in so short a time. * * * There is no doubt Harry (the decedent) is lonesome for you and the children. * * * George and Tom clapped their hands when they heard you were having overcoats made for them. * * * I can assure you we appreciate your kindness very much. * * * Hoping to see or hear from you soon, I am your affec. sister, Jennie."

Mrs. McCormack's other letter to proponent is dated October 18, 1907, and is also addressed to "Dear Lizzie," in which, among other things, we find:

"Just a few lines in a hurry to advise you that Harry (the decedent) went to the hospital to-day and expects to be operated on to-morrow. He felt very lonesome going. I wish you were with him to comfort him. He says he put it off as long as possible. He said he would like to see you and the children before going in. I think it would be advisable for you to start for home as soon as possible. While we all hope for the best, I am very much worried. * * * With love to all, I am, your sister, Jennie."

Actual cohabitation was conceded by the contestants, and these letters show that decedent and proponent had the repute of husband and wife in contestants' family, and were treated by the contestants as such. Proponent also introduced two affidavits of title verified by decedent July 9, 1902, and January 31, 1905, respectively. In the former he deposed that he was "married to Elizabeth," and in the latter that

"my wife, Elizabeth Garner, is over the age of twenty-one years." On January 31, 1905, he and proponent both executed a mortgage for $3,-500 to Henry Hahnenfeld and another, and in said mortgage they are described as "Henry J. Garner and Elizabeth Garner, his wife." In July, 1906, with Louis F. Comellas and Josephine, his wife (witnesses referred to above), "Henry J. Garner and Elizabeth M., his wife," executed two mortgages, each for $20,000, to Charles F. Bauerdorf, Esq., and on January 31, 1905, decedent executed and acknowledged a power of attorney wherein he did "authorize Elizabeth Garner, my wife, in my behalf," and "empower my wife, Elizabeth Garner," and "in all of which matters my wife, Elizabeth Garner, is hereby authorized to act," etc.

Proponent was not called. She offered no proof as to actual contract, in words in præsenti, of any so-called "common-law" marriage, nor did she attempt to prove a ceremonial marriage. She did, however, cause to be proved the laws of New Jersey to the effect that common-law marriages were recognized in that state in the year 1896. The strongest presumptions of the law are in favor of the legitimacy of the four infant children. In Matter of Matthews, 153 N. Y. 443, 47 N. E. 901, this doctrine is sustained, and the cases reviewed. Starr v. Peck, 1 Hill, 270, 272; Caujolle v. Ferrié, 26 Barb. 177, 185; Id., 23 N. Y. 90, 95, 107, 108; Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263; Wilcox v. Wilcox, 46 Hun, 32, 40; Hynes v. McDermott, 91 N. Y. 451, 459, 43 Am. Rep. 677; 1 Bish. Mar. & Div. § 447; 2 Whart. Ev. § 1298. And Martin J. says:

"The existence of such a presumption is in consonance with every correct sense of propriety and justice. Any other rule would be fraught with danger and produce immeasurable uncertainty. Property rights would be rendered doubtful, and the fair fame of their ancestors might be destroyed by the cupidity of remote heirs and next of kin. There might be others who would be willing to dishonor their ancestors and bastardize their relatives to increase their patrimony. * * * We have no hesitation in adhering to the principle that the law presumes legitimacy, and not illegitimacy; morality, and not immorality; social integrity, and not social dishonor—and in declaring such to be the law of this state."

See, also, Tracy v. Frey, 95 App. Div. 579, 88 N. Y. Supp. 874, and cases cited.

"Common-law marriages," so called, were on and after January 1, 1902, abolished in this state. Laws 1901, p. 933, c. 339. Prior to that date a common-law marriage might be brought about by a contract in words in præsenti, and it was held that it was not necessary to actually prove the contract itself. It is written, in Gall v. Gall, 114 N. Y. 117, 21 N. E. 106, by Judge Vann:

"The cohabitation, apparently decent and orderly, of two persons opposite in sex, raises a presumption of more or less strength that they have been duly married. While such cohabitation does not constitute marriage, it tends to prove that a marriage contract has been entered into by the parties. * * * It is sufficient if the acts and declarations of the parties, their reputation as married people, and the circumstances surrounding them in their daily lives, naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife. O'Gara v. Eisenlohr, 38 N. Y. 296; Badger v. Badger, 88 N. Y. 546, 554, 42 Am. Rep. 263; Hynes v. McDermott, 91 N. Y. 451, 457, 43 Am. Rep. 677. A present agreement between competent parties to take each other

for husband and wife constitutes a valid marriage, even if not in the presence of witnesses. Clayton v. Wardell, 4 N. Y. 230; Caujolle v. Ferrié, supra; Brinkley v. Brinkley, 50 N. Y. 184, 197, 10 Am. Rep. 460. Such a marriage may be proved by showing actual cohabitation as husband and wife, acknowledgment, declarations, conduct, repute, reception among neighbors and relations, and the like, and where the intercourse was illicit at first, but was not then accompanied by any of the evidences of marriage, and subsequently it assumes a matrimonial character, and is surrounded by the evidences of a valid marriage above named, a question of fact arises for the determination of the jury. They are to weigh the presumption arising from the meretricious character of the connection in its origin with the presumption arising from the subsequent acknowledgment, declarations, repute, etc., and decide whether all of the circumstances, taken together, are sufficient evidence of marriage."

In Matter of Hamilton, 76 Hun, 207, 27 N. Y. Supp. 813, Van Brunt, P. J. says:

"It is undoubtedly true that cohabitation and repute merely do not constitute a marriage. There must be an agreement or contract to be husband and wife. Mere living together as such is not sufficient. The agreement to be such is an absolute and vital prerequisite to constitute a valid marriage. But murder can be proved by circumstantial evidence, and there does not seem to be any reason why a valid marriage may not be established by the same class of proof. Men are convicted and executed without having eyewitnesses of their crime. Circumstances which inevitably lead to the conclusion of the commission of the crime are sufficient in a capital case, and in a civil case a preponderance of evidence which tends to establish the proposition is all that is required. So, where the issue is of marriage, although the contract itself may not be established by direct evidence, yet it may be established by circumstances. It may, from the actions of the parties, their visible relations to each other and their representations to others, be inferred that at some previous time they had entered into a contract of marriage, and that is all the dignity of the proof of cohabitation and repute. It is circumstantial evidence tending to establish a previously existing fact, and such proof may be as satisfactory as, and often more satisfactory than, the much more limited direct evidence which it is ordinarily possible to produce."

See, also Matter of Wells, 123 App. Div. 79, 108 N. Y. Supp. 164, and cases cited.

It would seem within the limitations of the facts established by the preponderance of evidence in this matter that a common-law marriage might be contracted in the state of New Jersey, even though the parties thereto were and continued to be residents of the state of New York, and an immediate return to this state had upon said marriage being accomplished; and this notwithstanding the prohibition in a decree of divorce obtained here against one of the contracting parties by her former husband. Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505; Thorp v. Thorp, 90 N. Y. 605, 43 Am. Rep. 189; Moore v. Hegeman, 92 N. Y. 521, 44 Am. Rep. 408; Matter of Schmidt, 42 Misc. Rep. 463, 87 N. Y. Supp. 428; Townsend v. Van Buskirk, 33 Misc. Rep. 287, 68 N. Y. Supp. 512. Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677, is very helpful here:

"In an action of ejectment, wherein plaintiff M. claimed as the widow and the other plaintiffs as children of H., a citizen of the United States, it appeared that H., who resided in the city of New York, while stopping at a hotel in London, in 1871, made the acquaintance of plaintiff M., an English subject and an employé in the hotel. A promise to marry on his part, and an intention of marriage between them was proved; also a mutual consent

to be, and to live together, as husband and wife, and a subsequent cohabitation in that apparent relation. The evidence, however, established that the cohabitation did not commence with a marriage, valid by the English law, and there was no evidence of a subsequent marriage, in accordance with that law. In June, 1871, the parties went to Paris, where they lived together as husband and wife, and he introduced her to acquaintances as his wife. They returned to London, where they lived together until his death, which occurred in 1874, and where the children, who are plaintiffs, were born. H. addressed M. as Mrs. H. and so addressed letters to her, and their life in England was the ordinary household life of persons lawfully married."

Andrews, J., says:

"Mr. and Mrs. Hynes, as has been stated, were in Paris during the summer of 1871. There was no proof given of the marriage law of France, and it was held on the former appeal in this case (82 N. Y. 41, 37 Am. Rep. 538) that, in the absence of proof to the contrary, it would be assumed that the requisites to constitute marriage are the same in another country as in our own, and it may be safely assumed as a fact that in France the mutual consent of. parties to assume the relation of husband and wife, followed by cohabitation, constitutes marriage, since, if it was otherwise, it could readily have been shown. The jury, in addition to their general verdict, made a special finding that the parties, while in France, entered into an agreement in præsenti to take each other as man and wife, and thenceforward cohabited together as such in France and England. There is no direct evidence of the interchange of consents during their stay in Paris. There was evidence that they lived together there in the apparent relation of marriage, and assuming that what occurred between them in Cleveland street (in London) did not constitute a valid marriage by the law of this state, for the reason that the law of England can only be resorted to, to determine the effect of that transaction, we are, nevertheless, of opinion that the jury were authorized to find that in France the requisite consents were interchanged, and that the parties then and there became husband and wife. The presumption of marriage from a cohabitation apparently matrimonial is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. In Morris v. Davies, 5 Cl. & Fin. 163, Lord Lyndhurst, speaking of this presumption, says: 'The presumption of law is not lightly to be repelled. It is not to be broken in upon or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory, and conclusive.' "

In the light of these authorities, I am satisfied that in this proceeding the legitimacy of Emily Garner, George Garner, Thomas Garner, and Jennie Garner, infants, children of and heirs at law and next of kin of this decedent, has been established, and the testimony offered by the contestants does not assume the proportions of "a mere balance of probability" against such presumption.

Such being the case, the contestants have no standing here, and I dismiss their objections upon the ground that they have no right to contest. Submit order on notice accordingly. As to the further trial of the propounded paper, the matter will be placed at the head of my contested will calendar for May.