(80 Misc. Rep. 540.)　　In re GRANDE'S ESTATE.

(Surrogate's Court, Columbia County.　April 26, 1913.)

1. BASTARDS (§ 1*)—WHO ARE ILLEGITIMATE.

The child of a man and woman united in marriage by a religious ceremony in a country where at that time only civil marriages were valid was illegitimate.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 1–3; Dec. Dig. § 1.*]

2. BASTARDS (§ 12*)—LEGITIMATION BY SUBSEQUENT MARRIAGE.

The child of a man and woman married by a religious ceremony in another country at a time when only civil marriages were valid was legitimatized, where her father and mother afterwards so lived and conducted themselves in this country as to create the presumption of what is called a "common-law marriage."

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 14, 15; Dec. Dig. § 12.*]

3. MARRIAGE (§ 40*)—SUFFICIENCY OF EVIDENCE—COMMON-LAW MARRIAGE.

Where a man and woman, who had contracted an invalid marriage in a foreign country, lived together in this state as husband and wife, spoke of each other as husband and wife in the presence of others, and the man told other people that the woman was his wife, it would be presumed, especially where the legitimacy of a child was involved, that after arriving in this country they interchanged matrimonial consents and thereby became husband and wife.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

4. MARRIAGE (§ 40*)—PRESUMPTION FROM COHABITATION.

The presumption of marriage from cohabitation apparently matrimonial is one of the strongest presumptions known to the law, especially in a case involving legitimacy; and where there is enough to create a foundation for the presumption it can be repelled only by the most cogent and satisfactory evidence.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

5. BASTARDS (§ 3*)—BURDEN OF PROOF.

A child is presumed to be legitimate, and the person asserting the fact of illegitimacy has the burden of establishing it.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 4, 5; Dec. Dig. § 3.*]

6. MARRIAGE (§ 40*)—PRESUMPTION AS TO DIVORCE FROM FORMER WIFE.

Where a wife left her husband and eloped with another man, and the husband subsequently remarried in a foreign country, it would be presumed, in support of the validity of the second marriage, that he had previously obtained a divorce from the first wife, especially where the party attacking the validity of the second marriage presumably could have proved that no divorce was obtained, if such was the fact, but failed to do so.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

Application for limited letters of administration on the estate of Carlo Grande.　Letters granted.

Curtis & Warren, of Ravena, for petitioner.
Anthony S. De Santis, of Utica, for contestant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

COFFIN, S. The petition of Mary A. Grande shows in her petition that Carlo Grande, her husband, died at his residence in the county of Columbia on May 9, 1912, leaving no will, and leaving him surviving the petitioner, two sisters, and one brother as his only next of kin, and possessed of personal estate not exceeding in value $200, and a right of action against the Empire Brick & Supply Company for the death of decedent. She also alleges that Terressa Grande Martelli claims to be a daughter of decedent, which claim petitioner alleges is not true.

On the return of the citation Terressa Grande Martelli appeared in person and answered orally, admitting all the allegations of the petitioner, except the allegation that the petitioner was the widow of decedent and the allegation that said Terressa Grande Martelli, the contestant, was not a daughter of decedent, which she denied.

Considerable evidence was introduced by both parties, and the same, so far as it is material, is briefly as follows:

In or about the year 1889 the decedent, Carlo Grande, and one Rosa Saco were united in a so-called marriage by a religious ceremony performed by a Roman Catholic Priest in a church at Carlopoli, Italy, and thereafter cohabited as man and wife at Carlopoli for a period of one year, during which time decedent introduced Rosa as his wife to various people and treated her as such. About one year after such so-called marriage decedent came to America and located in the city of Utica. After he came to America, a child of such union was born in Italy, where his wife was, who is the contestant, Terressa Grande Martelli.

About six months after the birth of said child the mother and the child came to America and went to Utica and lived with the decedent there from May until about December, during which time decedent and his so-called wife lived together as man and wife with the mother and father of his so-called wife; the decedent telling the mother and father of Rosa that Rosa was his wife, and making the same declaration to the uncle and two aunts of Rosa, declaring also to the mother and father of Rosa and her uncle and two aunts that the contestant was his daughter. One of the witnesses testified that decedent called Rosa his wife, and she called Carlo her husband, in the presence of many people, and that Carlo claimed contestant as his daughter and showed marked signs of affection for her.

In December, following her arrival in this country, Rosa, the so-called wife of decedent, eloped with one Vincenzo Mancino, taking contestant with her, and returning eventually to Italy, where she has since lived with said Vincenzo Mancino, and has had at least one child by him.

The contestant continued to live with her mother in Italy for some years, during which time she corresponded with her father, the decedent, at least every three or four months, being addressed in his letters as "Dear daughter," and she addressing him as "My dear father." She commenced corresponding with him when she was nine or ten years old, and kept it up until she came to America on June 5, 1908. She came at the request of her father and grand-

mother, who sent her the passage money, and when she landed in this country she went first to her grandmother in Utica. Upon her arrival there she wrote to her father, and he at once came to Utica and saw her, and she returned to his residence in Columbia county with him and lived with him for three or four months, then went back and spent three or four months with her grandmother, and then returned to her father in Columbia county, and was afterwards married in the city of Hudson. When the decedent first saw the contestant after her arrival in 1908, he hugged her and cried, "My daughter," and showed marked signs of affection for her.

On the 11th of February, 1904, Carlo Grande, the decedent, was united in marriage to the petitioner, Mary Arcuri, at the city hall in Carlopoli, in the province of Catanzaro, Italy, by the acting mayor of said town, and in accordance with the laws of the kingdom of Italy. In April following she and decedent came back to America, where they resided and lived together as man and wife until his death.

[1, 2] By the laws of the kingdom of Italy, in force at the time the ceremony was performed between decedent and Rosa Saco, only civil marriages had any validity. It is therefore clear that by the laws of Italy the so-called marriage between decedent and Rosa Saco had no validity, and the child of that union was illegitimate. If, however, decedent and contestant's mother afterwards so lived and conducted themselves in this country as to create the presumption of what is called a "common-law marriage," then contestant has been legitimatized.

[3] The case of Hynes v. McDermott, 91 N. Y. 452, 43 Am. Rep. 677, in my opinion, is decisive on this question. There the facts were in principle similar. One Hynes and a Mrs. Saunders commenced illicit intercourse in London, England, which was not sanctioned by a marriage valid by the English law. The following month they were in Paris, where an acquaintance saw them together at a hotel dinner table, and was introduced by Mr. Hynes to his wife as Mrs. Hynes, and he afterward frequently saw them at their temporary residence in Paris. Later they returned to England, where they lived together until Hynes' death. During that time he was in the habit of addressing her as Mrs. Hynes, and their life together was the ordinary household and family life of persons lawfully wedded, having children, the fruit of lawful wedlock, and he treated her with apparent respect and affection, and was fond of his children, and spoke of her in the presence of others as his wife.

The court said that if the issue of marriage depended upon the evidence that there was a marriage according to the forms of English law the plaintiffs could not recover, and that the presumption of such a marriage, raised in the first instance by proof of habit and repute, was rebutted by evidence on the part of defendants; but that, no proof having been given of the marriage law in France, and in absence of proof to the contrary, it would be assumed that the requisites to constitute marriage are the same in another country as in our own, and that it might be safely assumed as the fact that in France the mutual consent of the parties to assume the relation of husband and

wife, followed by cohabitation, constitutes marriage, and that the jury were authorized to find that in France the requisite consents were interchanged, and that the parties then and there became husband and wife.

[4] As was so forcibly said by the Court of Appeals in that opinion:

"The presumption of marriage from a cohabitation apparently matrimonial is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. * * * In Piers v. Piers, 2 H. L. Cas. 331, Lord Campbell said that the presumption could be negatived only by 'disproving every reasonable possibility.' "

[5] The case at bar in some repects is even stronger than the one just cited, because, while in the latter the union was meretricious in its inception, here a clear intent can be spelled out to enter into a relation sanctioned by a public, religious ceremony. I should prefer to call the marriage in Italy an illegal one rather than an illicit one, because the word "illicit" is more synonymous with "meretricious" than with "illegal." It must also be borne in mind that the presumption of the law is that the contestant is a legitimate daughter, and that those who assume the fact of illegitimacy have cast upon them the onus of establishing it. Caujolle v. Ferrié, 23 N. Y. 90.

I am constrained to hold that it must be presumed that Carlo Grande and Rosa Grande interchanged matrimonial consents after arriving in this country; that they then and there became husband and wife; and that the contestant, Terressa Grande Martelli, was thus legitimatized.

[6] The question next presents itself: What effect, if any, had the elopement and subsequent meretricious relation between Rosa Grande and Vincenzo Mancino upon the petitioner's rights? Must we presume that Carlo Grande committed the crime of bigamy when he married the petitioner?

In the case of Clayton v. Wardell, 4 N. Y. 230, the court held that the presumption that a meretricious union continued to exist as such was at least equal to the presumption in favor of the subsequent marriage, and that the most that can be said upon this point is that there is a conflict of presumptions, and in such a case the rule is that that must yield which has the least degree of probability to sustain it. If we held that the void union in Italy was presumed to continue void in order to sustain the subsequent marriage with the petitioner, it would be because the court would hesitate to presume that décedent committed a crime when he married petitioner. Is there no way by which the contestant's legitimacy can be sustained without being followed by the presumption that decedent committed the crime of bigamy when he married petitioner?

I have found no cases in this state in which the court has presumed the first marriage to have been legally dissolved in order to support the legality of the second marriage; but in the case of Matter of

Meehan, 150 App. Div. 681, 135 N. Y. Supp. 723, the Appellate Division in the First Department refers to a number of decisions in other jurisdictions to that effect. Hunter v. Hunter, 111 Cal. 261, 43 Pac. 756, 31 L. R. A. 411, 52 Am. St. Rep. 180; Erwin v. English, 61 Conn. 502, 23 Atl. 753; Pittinger v. Pittinger, 28 Colo. 308, 64 Pac. 195, 89 Am. St. Rep. 193; Potter v. Clapp, 203 Ill. 592, 68 N. E. 81, 96 Am. St. Rep. 322; Boulden v. McIntire, 119 Ind. 574, 21 N. E. 445, 12 Am. St. Rep. 453; Leach v. Hall, 95 Iowa, 611, 64 N. W. 790; Howton v. Gilpin (Ky.) 69 S. W. 766; Killackey v. Killackey, 156 Mich. 127, 120 N. W. 680; Maier v. Brock, 222 Mo. 74, 120 S. W. 1167, 133 Am. St. Rep. 513, 17 Ann. Cas. 673; Thewlis' Estate, 217 Pa. 307, 66 Atl. 519; Carroll v. Carroll, 20 Tex. 732; Thomas v. Thomas, 53 Wash. 297, 101 Pac. 865. And I might add the following quotation from 26 Cyc. 880:

"In the case of conflicting marriages of the same spouse this presumption [in favor of its validity] operates in favor of the second marriage. Accordingly the burden of showing the validity of the first marriage is on the party asserting it, and even where this is established it may be presumed in favor of the second marriage that at the time thereof the first marriage had been dissolved, either by a decree of divorce, or by the death of the former spouse, so as to cast the burden of adducing evidence to the contrary on the party attacking the second marriage. It has been held, however, that the presumption of divorce or death of a prior spouse will not be indulged in favor of the alleged second marriage, the proof of which rests merely on cohabitation and repute."

The Appellate Division, in the Meehan Case, supra, well says:

"The law indulges in presumptions from the necessities of the case, in the absence of sufficient evidence to establish the fact to be proved. While the known facts may be insufficient of themselves to justify a particular inference, they may tend to weaken or strengthen a particular presumption. * * * In this case the presumption of the validity of the second marriage is greatly strengthened by the uninterrupted cohabitation of the parties to it for more than 20 years and until the death of one of them."

If the court, in order to legitimatize a child, would presume, as in the case of Hynes v. McDermott, supra, that the parties thereto entered into an agreement in præsenti while in France to take each other as man and wife, if the court will presume that a union ordinarily illicit continues as such, even in the face of a public living together as reputed husband and wife, in order that the second marriage be not bigamous, is it too much for us to presume that Carlo Grande obtained a legal divorce from his first wife, after she eloped with Vincenzo Mancino and thereafter lived with him and bore children by him?

It was within the power, we assume, of the contestant to have proved by the evidence of the first wife that no divorce had ever been obtained, and that the marriage was still in force. This she failed to do, and I therefore am of the opinion that the first marriage must be presumed to have been legally dissolved prior to the marriage of decedent with petitioner.

Findings and the decree will be prepared in accordance with the above views, and limited letters of administration will be issued to Mary Arcuri Grande.