499 S.E.2d 503

**Robert BARKER, Appellant,**

v.

**Claire Lou BAKER, individually and as Personal Representative of the Estate of Barbara Carolyn Meares, Deceased; Elizabeth M. Hayes; Mary Ellen M. Cook, and James Milford Meares, Respondents.**

**In re Estate of Barbara C. MEARES, Deceased.**

**No. 2806.**

Court of Appeals of South Carolina.

Heard Dec. 2, 1997.

Decided March 9, 1998.

362

E.N. Zeigler, of Zeigler & Graham, Florence, for appellant.

Rodney C. Jernigan, Jr., of Scott & Jernigan; and Mary Layton Wells, Florence, for respondents.

HOWELL, Chief Judge:

After the intestate death of Barbara Carolyn Meares, Robert Barker filed a petition in probate court, claiming he was Meares's common-law husband. The probate court rejected Barker's petition, concluding he failed to establish the existence of a common-law marriage. Barker appealed to the circuit court, which affirmed the decision of the probate court. Barker again appeals, and we likewise affirm.

## I.

Meares, a Home Demonstration agent with the Clemson Extension Service, met Barker and began a sexual relationship with him in the mid 1960's. In 1970, after the death of Meares's father, Barker and Meares moved onto the Meares family farm to be with Meares's mother. Barker and Meares had separate bedrooms, but Barker generally slept on the living room floor because of health problems.

Barker managed the farm, although he never received any compensation from the farm and he gave the money earned from the farm to Meares. While Barker testified that he ran the farm as he wanted and put his own money into the operation, he admitted that Meares reimbursed him for expenses he incurred in connection with the farm.

After Meares was diagnosed with cancer in 1992, Barker took care of her during her illness, even bathing and clothing her. He testified that he stayed with Meares almost constantly when she was in the hospital in Florence.

In an effort to establish that Meares's family considered them to be married, Barker called several of Meares's relatives as witnesses. Their testimony established that Meares's family considered Barker to be a part of the family and that he was included in family gatherings and holiday celebrations before and after Meares's death. Meares's mother once told Barker that he was her "nicest son-in-law."

Although Barker testified that Meares's great-nieces and -nephews called Barker "Uncle Bob," other testimony established that the children called Meares "Aunt Carolyn" but called Barker "Mr. Bob." Meares's relatives testified that the community generally accepted Meares and Barker as "a couple," but that Meares referred to Barker as her boyfriend, not her husband.

Barker also presented the testimony of several witnesses who lived in the community where Barker and Meares lived. They testified that the couple's general reputation in the community was that they were married. The witnesses generally described the relationship between Meares and Barker as "kind" and "loving." One neighbor testified that Meares told him that she and Barker had a common-law marriage and that Meares often introduced Barker as her husband.

Similarly, witnesses who knew Meares professionally and through the Pilot Club testified that the people in the home demonstration clubs and the Pilot Club accepted Meares and Barker as a married couple. Several witnesses stated they had referred to Barker as Meares's husband in her presence, and that she never corrected them. A witness who was a member of Meares's home demonstration club testified that, shortly before she died, Meares asked the witness how she felt about the way Meares and Barker lived and if the witness believed in common-law marriage.

Barker admitted that he and Meares never had joint checking accounts, never held real estate jointly, and never filed joint tax returns. Barker further admitted that he never paid any medical bills or personal expenses for Meares. While Barker acknowledged that Meares did not normally refer to him as her husband, he testified that during her illness, she introduced him as her husband to several people at the hospital. When Barker was asked by his attorney to describe

the nature of his relationship with Meares, Barker responded, "More married than a lot of people that I knew."

The respondents, Meares's intestate heirs (the Heirs), presented evidence establishing that, while the family accepted the relationship between Meares and Barker, they did not consider Barker to be Meares's husband. Mary Ellen Cook, Meares's niece, testified that she never heard anyone refer to Barker as Meares's husband. Elizabeth Meares Hayes, Meares's sister, testified that she thought Barker "was just staying there [at the Meares farm] because he had nowhere else to go." Hayes testified that Barker never referred to himself as Meares's husband at any time during Meares's funeral. Instead, it was not until Barker accompanied Hayes and another sister to the probate court that Barker made any claim of a relationship. According to Hayes, when the clerk asked who were the heirs of the estate, Barker declared, "I lived there twenty-some years," and asked to what he was entitled. Similarly, Claire Meares Baker, Meares's sister and personal representative of her estate, testified that she never heard Barker refer to himself as Meares's husband or claim to have a common-law marriage until the day at the probate court.

The Heirs also presented witnesses from the community, including the former pastor of Meares's church and several members of her Sunday School class, who generally testified that Meares never indicated to them that she was married and that they believed her to be single. The women in the Sunday School class testified that Meares never brought Barker on class outings, even though members were allowed to invite spouses and friends. However, these witnesses admitted that, as Southern Baptists, they did not recognize common-law marriages as valid.

A witness who knew Meares professionally testified that Meares told her that Meares and Barker would never get married. Another witness for the Heirs who knew Meares through the Pilot Club testified that she believed Meares was not married to Barker because Meares never referred to Barker as her husband but instead called him her "friend." The witness testified that Meares once told her that Barker lived with her because "he had no where else to go."

The Heirs also called Red Woodham, who testified that he began a sexual relationship with Meares in 1953, and that they continued to see each other on an irregular basis until approximately 1987. Woodham testified that, although he and Meares exchanged cards and letters every year until her death in 1993, Meares never mentioned Barker to him. Woodham stated that he was surprised when he heard Barker was claiming to be Meares's common-law husband.

The documents admitted into evidence generally showed that Meares kept her own name, never using Barker's. Meares filed individual state and federal income tax returns describing herself as single, and all state and federal personnel records showed Meares as single. In fact, in at least one of the federal documents, Meares declared under penalty of perjury that she was single. Meares designated Barker as the beneficiary of her individual retirement account, describing him in the document as her "friend," while her estate or various relatives were named as beneficiaries of her life insurance policies and other retirement accounts. Although Meares once requested a change of beneficiary form for one of her life insurance policies, she never named Barker as beneficiary.

The Pilot Club membership lists for 1993 and 1994 did not include Barker's name in the space where spouses were generally listed. While the Pilot Club newsletter noting Meares's death listed Barker as her next of kin, Barker was not mentioned among Meares's survivors in the obituaries appearing in two local newspapers.

## II.

Barker raises several issues on appeal, most of them hinging on his contention that the probate court applied the wrong legal standard to his claim, failing to recognize a presumption in favor of common-law marriage.

At the center of Barker's argument are two lines of South Carolina common-law marriage cases. The first line of cases notes that the party claiming a common-law marriage must prove the existence of the marriage by a preponderance of the evidence. *See, e.g., Kirby v. Kirby,* 270 S.C. 137, 140, 241 S.E.2d 415, 416 (1978); *Ex Parte Blizzard,* 185 S.C. 131, 133,

193 S.E. 633, 634 (1937). The second line of cases notes that there is a strong presumption in favor of marriage by cohabitation, apparently matrimonial, coupled with social acceptance over a long period of time. *See, e.g., Jeanes v. Jeanes,* 255 S.C. 161, 166, 177 S.E.2d 537, 539 (1970); *Owens v. Owens,* 320 S.C. 543, 545, 466 S.E.2d 373, 375 (Ct.App.1996). In its order, the probate court did not refer to the presumption of marriage, but instead, citing *Kirby* and *Blizzard,* simply held that Barker failed to prove the existence of a common-law marriage. Barker contends that his evidence was sufficient to trigger the operation of the presumption, and that the evidence presented by the Heirs was not sufficient to rebut the presumption. We disagree.

■  In South Carolina, a common-law marriage exists if the parties intend to enter into a marriage contract. *Blizzard,* 185 S.C. at 133, 193 S.E. at 634; *accord Johnson v. Johnson,* 235 S.C. 542, 550, 112 S.E.2d 647, 651 (1960) ("It is essential to a common law marriage that there shall be a mutual agreement between the parties to assume toward each other the relation of husband and wife. Cohabitation without such an agreement does not constitute marriage."); *Rodgers v. Herron,* 226 S.C. 317, 335, 85 S.E.2d 104, 113 (1954) (A common law marriage "depends upon facts and circumstances evidencing a mutual agreement to live together as husband and wife, and not in concubinage."); *Owens,* 320 S.C. at 545, 466 S.E.2d at 375 ("A valid common-law marriage requires that the facts and circumstances show an intention on the part of both parties to enter into a marriage contract."); *see also* 52 Am.Jur.2d *Marriage* § 42 (1970) ("At common law no formal ceremony is essential to a valid marriage, and an agreement between the parties per verba de praesenti—that is, by words of the present tense, or a present agreement—to be husband and wife constitutes a valid marriage; no other ceremony is necessary.")

■  Direct evidence of the requisite intent, such as a public declaration that the couple is entering into a contract of marriage, however, may not be readily available. *See John-son,* 235 S.C. at 551, 112 S.E.2d at 652 (The facts "evidencing a mutual agreement to live together as husband and wife, and not in concubinage ... are often difficult of ascertainment

where the intent of the parties has not been formally and publicly declared.") (citation omitted). Thus, the existence of a common-law marriage frequently is proved by circumstantial evidence.

> The difference between marriage and concubinage in the circumstances stated rests in the intent of the cohabiting parties; the physical and temporal accompaniments of the cohabitation may be the same in both cases, but the intent in the two cases is widely apart always. The intent in marriage is usually evidenced by a public and unequivocal declaration of the parties, but that is not necessary; the intent may exist though never public and formally declared; nevertheless the intent must exist.... It is true that when the intent has not been formally and publicly declared, ... it may yet rest in circumstances.

*Kirby v. Kirby*, 270 S.C. 137, 140, 241 S.E.2d 415, 416 (1978). The circumstantial evidence typically relied upon to establish a common-law marriage includes evidence establishing that the parties have lived together for an extended period of time and have publicly held themselves out as husband and wife. *See, e.g., Kirby*, 270 S.C. at 142, 241 S.E.2d at 417 (finding common-law marriage where parties represented themselves as husband and wife in their community, filed joint income tax returns, and appeared as husband and wife on children's birth certificates); *Owens*, 320 S.C. at 546, 466 S.E.2d at 375 (finding common-law marriage where, *inter alia*, parties held themselves out as husband and wife, and entered into contracts and opened checking account as husband and wife); *cf. Cathcart v. Cathcart*, 307 S.C. 322, 414 S.E.2d 811 (Ct.App. 1992) (finding no common-law marriage where parties testified they did not intend to be married to each other, and parties did not refer to each other as husband and wife, did not file joint tax returns, and did not receive mail at the same address).

The presumption of marriage upon which Barker focuses his argument merely reflects the difficulty in proving the requisite present agreement to marry. Thus, if a party claiming a common-law marriage presents proof of apparently matrimonial cohabitation and long-term social acceptance of the couple as married, a presumption arises that the couple entered into a common-law marriage, notwithstanding the

absence of any proof of an express agreement to enter into a common-law marriage. The presumption, however, in no way lessens the claimant's burden of proving a common-law marriage by the preponderance of the evidence. *Kirby*, 270 S.C. at 141, 241 S.E.2d at 416; *Yarbrough v. Yarbrough*, 280 S.C. 546, 551, 314 S.E.2d 16, 18–19 (Ct.App.1984) ("It is settled that the person claiming a common law marriage must prove it by the preponderance of the evidence."). Instead, the presumption simply designates the facts that, if proven to the satisfaction of the fact-finder, will be sufficient to establish a common-law marriage unless properly rebutted. *See, e.g., In re Grande's Estate*, 80 Misc. 540, 141 N.Y.S. 535, 539 (N.Y.Sur. Ct.1913) (" 'The law indulges in presumptions from the necessities of the case, in the absence of sufficient evidence to establish the fact to be proved.' "); *In re Garner's Estate*, 59 Misc. 116, 112 N.Y.S. 212, 218 (N.Y.Sur.Ct.1908) ("*Where there is enough to create a foundation for the presumption of marriage*, it can be repelled only by the most cogent and satisfactory evidence.") (emphasis added).[1] The question this Court must resolve, therefore, is whether Barker presented evidence sufficient to trigger the presumption.

In its order, the probate court concluded that Barker had failed to prove that he and Meares entered into a common-law marriage. The probate court based its decision on "the extremely credible witnesses" and documentary evidence presented by the Heirs. As discussed above, the Heirs presented witnesses who testified that Meares and Barker were not viewed as married by the community, while Barker presented witnesses who testified that the community viewed the couple as married. Given the divergent views presented by these witnesses, and the court's description of the Heirs' witnesses as "extremely credible," it is clear that the probate court found Barker's community reputation witnesses less than credible. Thus, as we understand the probate court's order, the court accepted the testimony of the Heirs' witnesses that Meares and Barker were not perceived in the community as being married, and rejected the testimony of Barker's wit-

---

1. In *Jeanes*, our Supreme Court relied on New York cases, including *Grande's Estate*, when describing the nature of the presumption of marriage. *Jeanes*, 255 S.C. at 166–67, 177 S.E.2d at 539–40.

nesses that the community believed that Meares and Barker were married.

■ Because this action is one at law, *Richland Mem. Hosp. v. English,* 295 S.C. 511, 513, 369 S.E.2d 395, 396 (Ct.App.1988), and the question of whether a common law marriage exists is a question of fact, *Johnson v. Johnson,* 235 S.C. 542, 550, 112 S.E.2d 647, 651 (1960), we are bound by the probate court's factual findings, particularly its credibility determinations. *See Howard v. Mutz,* 315 S.C. 356, 361, 434 S.E.2d 254, 257 (1993) (If the proceeding in the probate court is in the nature of an action at law, neither the circuit court nor the appellate court may disturb the probate court's findings of fact unless a review of the record discloses there is no evidence to support them.).[2] Thus, the question is not what conclusion this Court would have reached had it been the factfinder, but whether the facts as found by the probate court have evidence to support them. The probate court's conclusion that Barker failed to prove the existence of a common-law marriage is inextricably intertwined with the court's determination of the credibility of the witnesses. For this Court to determine that Barker in fact established long-term social acceptance of Meares and him as married would require us to reject the probate court's credibility findings, an action we cannot take in this case. *Daisy Outdoor Adver. Co., Inc. v.*

---

**2.** In his brief, Barker contends our review of the factual issues in this case should be governed by the federal "clearly erroneous" standard, which allows a reviewing court to set aside a factual finding, "although there is evidence to support it, [when] the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The clearly erroneous standard is found in Rule 52(a) of the Federal Rules of Civil Procedure; however, as Barker recognizes, South Carolina's version of Rule 52(a) does not include the clearly erroneous standard. More importantly, the clearly erroneous standard is completely inconsistent with South Carolina's long-standing rules governing the scope of review of factual findings in legal actions. *See, e.g., Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976) ("In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings. The rule is the same whether the judge's findings are made with or without, a reference. The judge's findings are equivalent to a jury's findings in a law action.").

*Abbott*, 317 S.C. 14, 451 S.E.2d 394 (Ct.App.1994) (In an action at law tried without a jury, this Court will not disturb the trial court's findings of fact that depend on the credibility of witnesses.), *rev'd in part on other grounds*, 322 S.C. 489, 473 S.E.2d 47 (1996); *cf. Davis v. Fowler*, 17 S.C. 590 (1882).

As discussed above, the presumption in favor of marriage is triggered only upon satisfactory proof of cohabitation, apparently matrimonial, coupled with social acceptance over a long period of time. By failing to prove long-term social acceptance of the couple as married, Barker failed to establish the factual predicate necessary to trigger the presumption of marriage. The probate court, therefore, properly concluded that Barker did not prove a common-law marriage by a preponderance of the evidence.[3] Accordingly, for the foregoing reasons, the decisions of the probate court and the circuit court are hereby

**AFFIRMED.**

CURETON and HOWARD, JJ., concur.

---

3. Our resolution of this issue makes it unnecessary to individually address the other issues raised by Barker on appeal.