THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS 
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Gladys J. Haskins, Respondent,
v.
Lynn Ray Tidwell, Appellant.
 
 
 

Appeal From Clarendon County
R. Wright Turbeville, Family Court Judge

Unpublished Opinion No. 2006-UP-164  
Heard March 7, 2006  Filed March 17, 2006 

AFFIRMED

 
 
 
William T. Geddings, Jr., of Manning, for Appellant.
William Ceth Land, of Manning, for Respondent.
 
 
 

PER CURIAM:    Lynn Ray Tidwell (Ray) appeals from an order of the family court finding he entered into a common-law marriage with Gladys J. Haskins (Gladys) and granting Gladys a divorce from Ray.  We affirm.
FACTUAL/PROCEDURAL BACKGROUND
The parties met in the early 1980s and became involved in a relationship in 1988.  Gladys testified that in August 1988, she and Ray went to the beach and Ray purchased wedding rings.  According to Gladys, when they came back, Ray told everyone they got married at the beach.  Thereafter, the parties lived together until January 5, 2004.  During this time, they put their money together, maintained joint checking accounts, and paid bills together.  Gladys submitted into evidence a Brendles credit card in the name of Gladys Tidwell as well as some checks showing an account listed as Gladys J. Haskins or Lynn R. Tidwell.  The credit card showed it was issued in May 1990 and the checks were written in 1991 and 1992.  Gladys also testified she and Ray obtained an automobile insurance policy together, and she submitted insurance cards for the policy showing effective dates of 2003 and 2004.  Finally, Gladys submitted into evidence mail she and Ray received in December 2003. One was a Christmas card envelope from Rays daughter and son-in-law addressed to Ray and Mousey Tidwell.[1]  The other was from Gladys cousin and was addressed to Gladys and Ray Tidwell.  Gladys stated she told people she was in a relationship with Ray and they were like as one.  She testified Ray also said they were as one as a couple and were together like one person, and he continued to refer to them this way to other people after 1995.  Ray obtained a license plate that read AS ONE, and Ray told Gladys it meant she and Ray were as one person.  She believed their relationship was the same as marriage.  
In March 1991, Ray had a will made out indicating his intent to marry Gladys Haskins at some subsequent date.  Gladys testified she had a similar will drawn at the time.  In August 1991, when Ray was in jail, he asked Gladys to draw up a document indicating she was his common-law wife so they could have conjugal visits.  Gladys signed a notarized document stating she and Ray had been living together as common-law husband and wife since June 1988.  
On March 5, 1995, Gladys obtained a divorce from Donald Haskins, whom she had married in April 1963 and from whom she had been separated since December 1976.  Gladys testified that Ray paid for her divorce because he was tired of [her] being married to Donald.  She believed she was common-law married to Ray before her divorce, as well as after her divorce from Donald.  Gladys claimed she held herself out as being married to Ray after the divorce and everyone thought they were married.  She stated she wore her wedding rings and that Ray also wore his on occasion, continuing to do so after 1995.  
Gladys admitted she had filled out paperwork, both before and after 1995, indicating she was single or unmarried.  At a social security disability hearing in 1999, Gladys identified Ray as her boyfriend.  She also listed Ray as her boyfriend on bank account records in 2003, as well as a loan application in 2004.  The record reflects Gladys further identified Ray as her boyfriend during numerous hospital admissions in 1998 and 1999.  Gladys testified she listed herself as single because she believed she had to be married with a license and in front of a preacher or in a church in order to list herself as married on the documents.  Gladys denied that she and Ray had lived in separate residences, stating they had always lived together.  
Gladys presented the testimony of two others to support her position.  Her daughter, Donna Callen, testified that the parties lived together and purchased wedding rings.  Donna stated that about ten years ago both Gladys and Ray told her that they had gotten married.  She stated that, over the past ten years, she had not heard Ray say directly that they were married, but Ray referred to Gladys as his wife or his old lady, and he continued to do this until the parties separated.  Ray and Gladys participated in family get-togethers, including Fathers Day, and he told Donna he loved her like a daughter all the time.  She further stated her own children called him Grandpa Ray and that Ray never objected or told the children he was not their grandfather.  Donna heard Ray refer to himself and Gladys as one, telling Donna that they would always be together as one.  Tina Floyd also testified on behalf of Gladys.  She stated that from 1991 to halfway through 1995 Ray, who was a childhood friend of her husband, would come into their store/bar to speak to her husband.  When he was there, Tina, referring to Gladys, would ask where his wife or his old lady was and he would answer her.  Ray never objected to Tina referring to Gladys as his wife, and he never indicated she was his girlfriend and not his wife.  Although Ray himself never used the term wife, he did refer to Gladys as his old lady, which Tina understood to be his wife.  
Ray testified he was never married to Gladys and never held himself out as being married to her.  He claimed in June 2003, he was living in a garage apartment on the same property as the mobile home where Gladys lived.  Ray admitted Gladys stayed with him sometimes, and that he would stay with her when she was ill so he could take care of her, but claimed he usually slept on the couch when she was sick.  Ray denied that he paid for Gladys divorce in 1995 and testified he did not care if she obtained one.  He stated he had a license plate on his vehicle that read AS ONE, but claimed it did not refer to him and Gladys, and meant only that he considered himself as one.  Ray also denied ever getting any wedding rings at the beach or giving a wedding ring to Gladys.  He stated their relationship continued after Gladys divorce in 1995 as it had been prior to the divorce, sharing expenses, having sex, having car insurance together, and him referring to her as his old lady on occasion.  He further admitted his license plate read AS ONE after 1995.  
The family court determined Gladys met her burden in establishing a common law marriage between the parties.  The court found as follows:  (1) the preponderance of evidence showed Ray not only knew about Gladys divorce from her former husband, but encouraged her to obtain the divorce and helped her pay for it; (2) after the divorce, the parties continued to live together as they did prior to the divorce; (3) the parties lived together from 1988 until January 2004; (4) Ray referred to the couple as one and the cohabitation was apparently matrimonial; (5) Ray referred to Gladys as his old lady and never took any action to negate the strong presumption in favor of marriage; (6) the parties treated each other as husband and wife; and (7) Gladys statements that they were not married referred to her belief that a ceremonial marriage was necessary for them to be legally married and were not made with the idea of negating the presumption of marriage.  
STANDARD OF REVIEW
The issue of whether a common-law marriage exists is a question of law, and this courts review is therefore limited to a determination of whether the trial judges findings are supported by any evidence.  Callen v. Callen, 365 S.C. 618, 623, 620 S.E.2d 59, 62 (2005).  The question is not what conclusion this court might reach after reviewing the facts, but whether the facts as found by the trial judge are supported by the evidence.  Id. at 629, 620 S.E.2d at 65 (Toal, C.J., dissenting); Tarnowski v. Lieberman, 348 S.C. 616, 619, 560 S.E.2d 438, 440 (Ct. App. 2002).      
LAW/ANALYSIS
Ray contends the family court erred in holding Gladys sustained her burden of proving by a preponderance of the evidence (1) the existence of a new mutual agreement to enter into a common-law marriage after Gladys divorce from Donald and (2) the existence of a common-law marriage.  He argues the majority of Gladys evidence concerns the time period in which she was married to Donald, and that this evidence must be disregarded.  He maintains the evidence offered after the impediment to marriage was removed is insufficient to prove a common-law marriage, it fails to show a new agreement between the parties, and that the record is devoid of evidence of a mutual intent of the parties to enter a common-law marriage.  He further asserts the evidence he presented is sufficient to overcome any presumption of matrimony.
The party claiming the existence of a common-law marriage must prove the same by the preponderance of the evidence.  Callen v. Callen, 365 S.C. 618, 623, 620 S.E.2d 59, 62 (2005); Kirby v. Kirby, 270 S.C. 137, 140, 241 S.E.2d 415, 416 (1978).  In South Carolina, a common-law marriage is formed when two parties contract to be married.  Callen, 365 S.C. at 624, 620 S.E.2d at 62.  Essential to a common-law marriage is a mutual agreement between the parties to assume the relation of husband and wife.  Tarnowski v. Lieberman, 348 S.C. 616, 619, 560 S.E.2d 438, 440 (Ct. App. 2002).  The fact finder is to look for mutual assent:  the intent of each party to be married to the other and a mutual understanding of each partys intent.  Callen, 365 S.C. at 624, 620 S.E.2d at 62.

A party need not understand every nuance of marriage or divorce law, but he must at least know that his actions will render him married as that word is commonly understood.  If a party does not comprehend that his intentions and actions will bind him in a legally binding marital relationship, then he lacks intent to be married.  A lack of intent to be married overrides the presumption of marriage that arises from cohabitation and reputation.  South Carolina does not impose marriage upon a couple merely because they intend to be together forever.

Id. at 626, 620 S.E.2d at 63 (citation omitted).   
Direct evidence of the requisite intent, such as public declaration by the parties of their entering into a contract of marriage, may not be readily available.  Barker v. Barker, 330 S.C. 361, 367, 499 S.E.2d 503, 507 (Ct. App. 1998).  Thus, no express contract is required.  Rather, the agreement may be inferred from the circumstances.  Callen, 365 S.C. at 624, 620 S.E.2d at 62.

The difference between marriage and concubinage in the circumstances stated rests in the intent of the cohabiting parties; the physical and temporal accompaniments of the cohabitation may be the same in both cases, but the intent in the two cases is widely apart always.  The intent in marriage is usually evidenced by a public and unequivocal declaration of the parties, but that is not necessary; the intent may exist though never public and formally declared; nevertheless the intent must exist.  . . .  It is true that when the intent has not been formally and publicly declared, . . .  it may yet rest in circumstances.     

Kirby, 270 S.C. at 140, 241 S.E.2d at 416 (quoting Tedder v. Tedder, 108 S.C. 271, 276, 94 S.E. 19, 20 (1917)).
There is a strong presumption in favor of marriage by cohabitation, apparently matrimonial, coupled with social acceptance over a long period of time.  Tarnowski, 348 S.C. at 620, 560 S.E.2d at 440; Barker v. Barker, 330 at 367, 499 S.E.2d at 506; Owens v. Owens, 320 S.C. 543, 545, 466 S.E.2d 373, 375 (Ct. App. 1996).  Thus, when the proponent proves that the parties participated in apparently matrimonial cohabitation, and that while cohabiting the parties had a reputation in the community as being married, a rebuttable presumption arises that a common-law marriage was created.  Callen, 365 S.C. at 624, 620 S.E.2d at 62 (citing Jeanes v. Jeanes, 255 S.C. 161, 166-67, 177 S.E.2d 537, 539-40 (1970)).  This presumption may be overcome by strong, cogent evidence that the parties in fact never agreed to marry.  Id.  (citing Jeanes, 255 S.C. at 167, 177 S.E.2d at 540).  While an admission of nonmarriage by one party, fortified by strong circumstances, may suffice to overcome the presumption of marriage from cohabitation and reputation, such an admission is insufficient to overcome the presumption where it is shown the admission may well have been made with reference to a ceremonial marriage, and not uttered with the idea of negating the marital status.  Owens, 320 S.C. at 545, 466 S.E.2d at 375.
It is well settled, however, when there exists an impediment to marriage, such as one partys marriage to a third person, no common-law marriage may be formed, regardless of whether there is any mutual assent.  Callen, 365 S.C. at 624, 620 S.E.2d at 62. Our courts have held that a relationship illicit at its inception does not ripen into a common-law marriage once the impediment to marriage is removed.  Instead, the law presumes that the relationship retains its illicit character after removal of the impediment.  Johns v. Johns, 309 S.C. 199, 201-02, 420 S.E.2d 856, 858 (Ct. App. 1992); Prevatte v. Prevatte, 297 S.C. 345, 349, 377 S.E.2d 114, 117 (Ct. App. 1989).  After the impediment is removed, the relationship is not automatically transformed into a common-law marriage, but is presumed to remain non-marital.  Callen, 365 S.C. at 624, 620 S.E.2d at 62.  In order for the relationship to become marital, there must be a new mutual agreement either by way of civil ceremony or by way of recognition of the illicit relation and a new agreement to enter into a common law marriage.  Id.  (quoting Kirby, 270 S.C. at 141, 241 S.E.2d at 416).  This new mutual agreement must be shown to exist by the preponderance of the evidence.  Kirby, 270 S.C. at 141, 241 S.E.2d at 416.  However, such agreement may be gathered from the conduct of the parties.  Johns, 309 S.C. at 202, 420 S.E.2d at 858; Prevatte, 297 S.C. at 349, 377 S.E.2d at 117.
Turning to the parties conduct after removal of the impediment to marriage, the record shows that Ray admitted the parties relationship continued after Gladys divorce in 1995 as it had been prior to the divorce, where they shared expenses, engaged in sex, obtained car insurance together, Ray referred to Gladys as his old lady, and his license plate read AS ONE.  There is also evidence of record that the parties lived together throughout their relationship, that Gladys believed their relationship was the same as marriage and held herself out as being married to Ray after the divorce, everyone thought [they] were married, that Ray used the phrase AS ONE on his license plate to refer to them as one person and continued to refer to them this way to other people after 1995, and that Gladys wore her wedding rings and Ray also wore his on occasion, continuing to do so after 1995. There is further independent evidence of the parties apparently matrimonial relationship subsequent to the divorce.  Two envelopes post-marked December 2003 were addressed to Ray and Mousey Tidwell and Gladys and Ray Tidwell.  Finally, Gladys daughter testified Rays references to Gladys as his wife or his old lady continued up until the time the parties separated, and Tina Floyd testified Ray never corrected her when she referred to Gladys as Rays wife.  Accordingly, there is some evidence, based on the conduct of the parties, of a new agreement between them to enter into a common-law marriage after the impediment was removed by Gladys divorce from Donald in March 1995.  Additionally, there is evidence Gladys actions in listing herself as unmarried or single and referring to Ray as her boyfriend were based on her belief that a ceremonial marriage was necessary to refer to a marital relationship in legal documentation and these statements were thus made with reference to a ceremonial marriage, not uttered with the idea of negating the parties marital status.
As previously noted, this courts review is limited to a determination of whether any evidence supports the family courts findings.  The question is not what conclusion this court might reach on the issue had it been the fact-finder, but whether the facts as found by the family court are supported by the evidence.  Given our limited standard of review, we are constrained to uphold the family courts decision in this matter.
For the foregoing reasons, the order of the family court is
 AFFIRMED.
GOOLSBY, HUFF, and STILWELL, JJ., concur.

[1]Mousey is Gladys nickname.