RUTLEDGE v. TUNNO.

FRENCH SPOLIATION CLAIMS—ILLEGITIMATE CHILDREN.—Under the acts
of Congress as to French Spoliation Claims, the descendants of
illegitimate children of ancestor do not take in this State, but the
fund goes to the statutory next of kin, according to the statute of
distribution of the State of the domicil of the original sufferer.

Before WATTS, J., Charleston, September, 1903. Affirmed.

Action by B. H. Rutledge, administrator *de bonis non* of
Adam Tunno, against M. R. Tunno *et al.* The following
is the report of Master Sass, to whom all issues were referred:

"The issues presented in this case are as follows: The
plaintiff, B. H. Rutledge, is the stakeholder of a fund which
is in his hands under the following circumstances: Letters
of administration upon the estate of Adam Tunno were
granted to plaintiff by the probate court of Charleston
County on the 24th of March, 1899. The said administrator was then substituted by an order of the Court of Claims
in the place of his father, the late B. H. Rutledge, Esq., who
had been previously appointed administrator of Tunno, and
who died in 1893, in a suit then pending in said Court of
Claims, under the French Spoliation Act. On the 22d of
June, 1899, plaintiff received a check from the United States
Treasury payable to B. H. Rutledge, administrator of Adam
Tunno, survivor of Tunno & Cox, for the sum of $21,167.83,
the amount of the award in said case. From this fund plaintiff has paid over to the Causten Agency of Washington one-
third part thereof, which was due them under a contract
with the administrator for the prosecution of the claim. He
still holds in his hands the sum of $14,111.87 subject to the
commissions of the administrator. The ownership of this
fund is the question which this Court is called upon to decide.
The claim upon which the money was recovered was a claim

of the copartnership of Tunno & Cox. Presumably the partners held it in equal shares. It is attempted to show upon the authority of an expression in the will of Adam Tunno, in which he declares that he has 'finally settled with Elizabeth Cox, the widow and executrix of my late partner, James Cox, as will appear by certain deeds or discharges now in my desk;' that the estate of James Cox has no other interest in the proceeds of this claim; but such a position cannot seriously be maintained in view of the fact that no other evidence upon the point has been adduced, no trace having been found of the deeds and discharges referred to. Whatever the Cox interest may be, and it is apparently admitted that the partners shared equally in this fund, it must be adjudged, with the evidence now before us, to have been paid to the plaintiff under a misapprehension of the treasury department that he represented the next of kin of Cox. Diligent search has been made by plaintiff to discover who the heirs of Cox may be, but without success. No administrator or other representative of his estate was made a party to this bill, there being no such administrator at the time of the filing of the bill. During the progress of this litigation an intervention was filed on behalf of an administrator of the estate of Cox, appointed after the litigation began, asking to be made a party to this suit, which petition was refused by the Supreme Court of this State. (See 63 S. C., page 705.)

"Under this state of facts it is claimed by the treasury department that the Cox share, which I find to be one-half of the net fund in the hands of the administrator, should be returned to the department, as having been paid over in error to the administrator of Tunno. And I think that such a disposition should be decreed by the Court, due provision being made for such expenses as should properly be chargeable against such fund.

"To the portion of the fund admitted to belong to the estate of Adam Tunno, several claimants appear. One set of claimants are known in this case as the Barguet heirs.

26—69

They are mulattoes and are descendants of Barbara Barguet, who before her marriage to Barguet was known as Barbara Tunno, and whom the evidence shows to have been the putative daughter of Adam Tunno by Margaret Bettingall, described in the will of Adam Tunno as 'the free black woman, Margaret Bettingall,' and in the same words in the will of Margaret Bettingall herself. If the claim of this group of claimants be admitted, there would be no necessity to look further, for as the only direct descendants of Adam Tunno, they would take the whole estate. But failing in their claim, the only other claimants are the descendants of the three brothers of Adam Tunno, and as between them the question arises whether they take *per stirpes* or *per capita*.

"A brief statement of the facts must be made. Adam Tunno died on or about the     day of January, 1833, leaving of force his last will and testament, which is in evidence. He had three brothers only who left issue, to wit: William Tunno, John Tunno and Archibald Tunno. William Tunno married and died leaving three children, all of whom died previous to March, 1891. The three children were Ann Tunno, Selina Tunno and John Champneys Tunno. The two daughters, Ann and Selina Tunno, died unmarried and without issue previous to March, 1891. John Champneys Tunno died in the year 1858, leaving surviving him the following children: William M. Tunno, Matthew R. Tunno, Mary Tunno, Rebecca Tunno and John Tunno Champneys (whose name was then changed.) Mary Tunno died unmarried and without issue in 1880. Rebecca Tunno died in 1898 unmarried and without issue. John Tunno Champneys died in    , leaving a widow, Ozella K. Champneys, and six children—John Tunno Champneys, Ozella K. Champneys, who died in 1890, unmarried and without issue, Elizabeth Knudsen, Annie Osborne, Mary O. Osborne and William Topp Champneys.

"John Tunno married and died, leaving one son, who died unmarried and without issue, and one daughter, who married

Sartoris, and died previous to 1891, leaving one son, Alfred Sartoris, who is a party to the suit.

"Archibald Tunno died in London in 1830, having married and leaving a daughter, Elizabeth Webb. She married and left issue and died 11th November, 1852. Two only of the children that survived her lived until 1891, and they are still alive and are the defendants herein, Augustus Tunno Higgs and Mary Calhoun Webb.

"Adam Tunno was a merchant living in Charleston in the first quarter of the last century. He died in 1833, and his will, dated in 1831, is in evidence. He was a free—and as the evidence shows—a loose liver. By his will he sets aside a fund of $12,000 'to and for the uses and purposes set forth in a paper in my handwriting and with my own proper name subscribed thereto, bearing the same date as this will, which said instrument of writing shall be taken as part of this my will.' The paper referred to is attached to the will as probated. It directs the disposition of said fund 'to the several names now stated, the parties being either under my protection or my servants, my property.' Here follow the names referred to, first among which are the following items: 'To the free black woman, Margaret Bettingall, with her daughter, Hagar Cole and children, $2,500. To Barbara Barquet by her trustees, $2,500.' The other bequests are of smaller amounts and of apparently the same character.

"It is not pretended that any ceremony of marriage was ever performed between Adam Tunno and Margaret Bettingall, but it is claimed they lived together as husband and wife. The testimony going to support this allegation is entirely that of the Barguets themselves, or rather of the defendant, Liston W. Barguet, the son of Barbara Barguet and grand-son of Margaret Bettingall, and of certain colored witnesses who testify to cohabitation and repute.

"I do not think it necessary to go into a detailed analysis of all the testimony on this point.

"The question of marriage is one of mixed law and fact.

As was said by Chief Justice Moses, in *Lucker* v. *Wicham,* 5th S. C., p. 413 : 'The existence of a marriage is a question of fact. Whether founded on an expressed contract, or inferred from circumstances, which necessarily imply that the relation of husband and wife existed between the parties, the result must be obtained through the medium of the evidence adduced in the cause. * * * If it * * * depends on cohabitation and repute, then the effect must be judged by a comparison of all the circumstances relied on by both sides, and even cohabitation and repute will not avail when the proof is clear that the parties were never married.' Such is the result of the authorities in South Carolina, and, if we err not, in all the States where marriage is regarded merely in the light of a civil institution.

"In South Carolina, marriage has always, so far as the law is concerned, been regarded as a mere civil contract. No ceremony is necessary. All that is required is 'the agreement of the parties with an intention that *that agreement* shall *per se* constitute the marriage. They may express the agreement by parol, they may signify it by whatever ceremony their whim, or their taste, or their religious belief may select. It is the agreement itself, and not the form in which it is couched, which constitutes the contract. The words used or ceremony performed are mere evidence of a present intention and agreement of the parties.' *Fryer* v. *Fryer,* Rich. Eq. Cases, page 92.

"It is what these persons *intended to do when they thus came together* that fixes their status. If they then agreed, before copulation, that they took each other as husband and wife, and intended the act of copulation as the performance of the contract, it was a good marriage. But there must be a present contracting intention at the time, and if the intercourse began meretriciously, no amount of subsequent cohabitation and repute will transform the connection into a marriage. When we know the origin of the connection to have been unlawful, the continuance of that connection can never become lawful. *Fryer* v. *Fryer, supra,* page 100. An

actual agreement of marriage fully perfected as an agreement, constitutes the parties man and wife, although never followed by copula. On the other hand, copula, without such agreement, is clearly illicit. *Fryer* v. *Fryer,* page 96.

"To condense some of the expressions of the Chancellor in the admirable opinion of the Court of Appeals delivered in that case, marriage is always an executed, never an executory, contract. It is not what the parties intend to de hereafter, but what they intentionally do now, that constitutes the tie. The essential fact is susceptible of an infinite variety of proof. It may be proved by those who witnessed it when it took place, or by the subsequent declarations or acknowledgments of the parties, or by their conduct and the attitude they maintain towards each other and the world. But there is a clear distinction between the fact itself of marriage and the evidence of that fact.

"The acknowledgment of a marriage does not constitute the marriage any more than the acknowledgment of any other fact constitutes that fact. It is evidence only, and is not conclusive even on the parties themselves. It must be considered in the light of the surrounding circumstances.

"The 'surrounding circumstances' in this case preclude, in my opinion, the conclusion that Adam Tunno intended to make Margaret Bettingall his wife, or that he ever so considered her. No witness has testified that he appeared with her in public, at church or at the theatre, or at any place 'where merchants most do congregate.' He made many conveyances of real estate, and upon no such deed did Margaret Bettingall renounce dower as his wife. It is plain that in the community he was regarded as a bachelor. The repute which will warrant the presumption of marriage is said in *Fryer* v. *Fryer, supra,* to be 'uniform and uninterrupted and undoubting belief.' Has any such been shown by the evidence in this case? The testimony upon this point will not stand a moment's analysis. Thos. N. Holmes, a negro 92 years old, who is relied upon to prove this repute, admitted upon cross-examination that he had never heard

Adam Tunno call Margaret his wife, nor heard her call him her husband, and that he never heard any white person speak of her as his wife. The 'community' to which the colored witnesses on this point referred, was the colored community. Mr. Tunno's will shows that he did not regard the 'free black woman, Margaret Bettingall,' who he lumped together with others mentioned, as anything more than his servant, or a person under his protection. It is inconceivable that he should have spoken thus of his wife. Furthermore, the fact that Margaret was a black woman, of itself raises the presumption that the relation between Adam Tunno and herself was that of concubinage (*Loyd* v. *Rawl,* 63 S. C., 244), and makes the fact of marriage more difficult to establish. It seems to me that the testimony in this case utterly fails to establish that fact.

"I hold as a conclusion of law and of fact that Adam Tunno and Margaret Bettingall were never married and did not regard themselves as married, and that Barbara Barguet was illegitimate.

"But it is claimed that even if Barbara Barguet was illegitimate, yet her heirs are entitled to recover in this case, because, 'under the act of Congress this appropriation is a pure gift or donation from the government of the United States' to the blood of Adam Tunno, and under the common law bastards being capable of taking a gift, Liston W. Barguet and the other descendants of Adam Tunno, if held illegitimate in fact, take the fund as a gift, and being of the blood of Tunno, are entitled to receive it under the act of Congress making the appropriation.

"This proposition and its various corollaries have been most ably and ingeniously argued by counsel for the Barguet heirs, but they have failed to convince me of the correctness of their contention.

"The act of 1891, under which this appropriation was made, has received judicial interpretation at the hands of the Supreme Court of the United States in the case of *Flagge* v. *Balch,* 162 U. S., 439 and 463, which case settled

the principal questions arising under said act, and established the fact .that the money in the hands of the plaintiff was appropriated by Congress not to be held as a part of the estate of the testator, but as a gift to individuals who were selected on account of their blood relationship to the original sufferer. The gift took effect on the date of the passage of the act, and the money is to be divided among those who were then the statutory next of kin of the said sufferer, to be determined according to the statute of distribution of the respective States of the domicile of the original sufferer.

"The principle thus laid down is, in my opinion, fatal to the contention that the Barguet heirs take in spite of the illegitimacy of Barbara Barguet. The statute of distributions of this State, the domicile of Adam Tunno, excludes bastards from inheriting and does not recognize them in any manner -as 'of the blood' of the .putative father. This dis- poses, I think, of the whole argument with regard to the meaning of the words 'next of kin' in the civil law. The statute of South Carolina fixes the next of kin of Adam Tunno at the time of his death as his brothers or their chil- dren. Who, then, were the statutory next of kin in March, 1891, the date of the passage of the act? The three brothers of Adam Tunno, who left issue, were dead. They were the *heredes facti* of the statute, and in equal degree, and had they been now alive they would have shared equally in this fund. Their descendants, living at the date of the act, as hereinafter set forth, are also in equal degree, and taken altogether, *per capita,* they fulfill the requirements of the statute. They were all living at the date of the act; they are all next of kin of Adam Tunno in equal degree, and being all of the blood of Adam Tunno, the purpose of the gift or gratuity which the act designed is fully subserved without preference or inequality by such a method of distri- bution. If the *per stirpes* construction contended for by some of the claimants be adopted, it amounts practically to determining the next of kin by the date of the death of Adam Tunno and not by the act. This makes a distinction between

the great-nephews and nieces of Adam Tunno, which, in my opinion, does not conform to the purpose of the act as judicially declared in *Flagge* v. *Balch,* and should not be adopted unless expressly required by the statute. Accepting the terms 'next of kin at the date of the act' as denoting a class of takers, is there any doubt that each one of these claimants can equally bring him or herself within the terms of such gift? And, if so, on what ground can the Court exclude any one of them from an equal participation in the fund?

"I hold as a conclusion of law that the great-nephews and nieces of Adam Tunno, living at the date of the passage of the act in March, 1891, take the whole of the fund involved herein among them in equal shares *per capita.*

"I, therefore, respectfully recommend:

"That a decree be made directing that the fund in the hands of the administrator, after deducting the proper fees and expenses of this case, be paid over as follows: One-half of the said net fund to be repaid to the treasury department of the United States for the benefit of the Cox interest, the same having been paid in error to the present administrator, and that the balance of the said net fund be paid over to the great-nephews and nieces of Adam Tunno, living at the date of the passage of the act in March, 1891, as hereinbefore ascertained, the same to be paid over to them in equal shares *per capita.*

"I further recommend, upon the testimony taken before me and filed with this report, that a fee of $500 be allowed to the plaintiff's attorneys herein, the said amount to be charged against the whole fund in the hands of the administrator, the litigation having been conducted for the benefit of the whole fund."

From Circuit decree confirming this report, the defendants, Liston W. Barguet, Bissuet Barguet, Mary L. Enberg, James B. Plumeau, Eudora Plumeau, Mary Dudley, Matilda Smith, George Barguet and Pierre Barguet, appeal, on the following exceptions:

"1. His Honor erred in overruling the exceptions of appellant to the master's report and erred in confirming the same.

"2. His Honor erred in directing that the funds in the hands of Benjamin H. Rutledge, as administrator *d. b. n. c. t. a.* of Adam Tunno, be applied and distributed as recommended in said report of G. H. Sass, Esq., master.

"3. Because his Honor erred in holding it was proper and lawful that one-third of $21,167.83 (the appropriation made by Congress and paid over to B. H. Butledge, administrator of Adam Tunno, survivor of Tunno & Cox), should be given to the Causten Agency of Washington. Said payment of one-third being for services rendered by said Causten Agency in lobbying and otherwise procuring legislation by which the $21,187.83 was appropriated, and the payment of said one-third being, therefore, against public policy and unlawful.

"4. The above named parties except because his Honor erred in ruling that one-half of $14,111.87, the amount remaining after extracting the above mentioned one-third of the original appropriation, had been paid over by the treasury department of the United States under a misapprehension to B. H. Rutledge, as the representative of the 'next of kin' of James Cox, deceased.

"5. Because his Honor erred in holding that as a matter of fact there are no existing 'next of kin' of James Cox.

"6. Because his Honor erred in holding that due diligence has been exercised in an endeavor to discover the 'next of kin' of James Cox, deceased, no advertisement for them having been made.

"7. Because his Honor erred in not holding that under the settlement made between Elizabeth Cox, widow and administratrix of the late James Cox, the entire interest of the said James Cox, in the above mentioned appropriaton, passed to and became the property of Adam Tunno and belongs to Adam Tunno's next of kin.

"8. Because his Honor erred in holding that one-half of $14,111.87 must be returned to the treasury department of

the United States as having been paid in error to B. H. Rutledge, administrator of Tunno.

"9. Because his Honor erred in holding that Barbara Tunno having been proved to be the daughter of Adam Tunno, it is incumbent upon her descendants, the claimants above named, to establish a marriage between Adam Tunno and the mother of Barbara Tunno.

"10. Because Barbara Tunno having been proved to be the daughter of Adam Tunno, his Honor erred in not holding that the presumption of law is that said Barbara Tunno is legitimate, and those who controvert this presumption must prove illegitimacy by irrefragable evidence.

"11. Because his Honor erred in not finding that the evidence proved and established that Adam Tunno and Margaret Bettingall Tunno were man and wife, and that Barbara Tunno, their daughter, was the legitimate child of Adam Tunno.

"12. Because his Honor erred in not holding that if Barbara Tunno was, as a matter of fact, illegitimate, that by an act of Congress this appropriation is a pure gift or donation of the United States to the blood of Adam Tunno, and under the common law, bastards being capable of taking a gift, Liston W. Barguet and the other descendants of Barbara Tunno above named, though they might be illegitimate in fact, take the fund as a gift, and being of the blood of Tunno, are entitled to receive it under the act of Congress making the appropriation.

"13. Because his Honor erred in holding and deciding that the fund belongs to and should be distributed among the collateral relatives of Adam Tunno instead of his direct descendants.

"14. Because his Honor erred in not holding and finding that the term 'next of kin' in the act of Congress has the meaning given it under the civil law, and includes legitimates and illegitimates alike, and under this construction of the act of Congress, Liston W. Barguet, Bissuet Barguet, Mary L. Enberg, James B. Plumeau, Eudora Plumeau, Mary Dud-

ley; Matilda Smith, George Barguet and Pierre Barguet are entitled to the fund, being of the blood of Adam Tunno and his 'next of kin.'

"15. Because his Honor erred in not finding that under the statutes of New York, of which State Liston W. Barguet and Bissuet Barguet are citizens and residents, they were and are entitled to share in this fund, even though they should be illegitimate, and under the statutes of the State of Illinois, of which State Mary Dudley, Matilda Smith and George Barguet are citizens and residents, they would be entitled to share in this fund, even though illegitimate. That, therefore, the act of Congress had this in contemplation, and that the true meaning and construction of said act would not exclude them from the benefits of the gift or bounty of the United States government simply because the place of distribution happens to be South Carolina, whose statute of distribution differs in this respect, from the statutes of New York and Illinois and many other statutes of the Union.

"16. Because his Honor erred in not holding that the term 'next of kin,' as used in the act of Congress, must have one and the same meaning and effect and a uniform operation throughout the United States, and that it should not be construed so as to exclude the same parties in one State from participating in the government's bounty where in another State they would be left in.

"17. Because his Honor erred in not holding that the master was in error in refusing the requests of findings of law and fact submitted in writing and filed with him at the hearing."

*Messrs. George H. Moffett* and *Claude B. Northrop,* for appellants, cite: *Presumption is in favor of legitimacy:* 23 N. Y., 90. *"Next of kin," used in the act, should have a uniform meaning throughout the Union, and being construed in other States to include illegitimates, should be so here:* 5 Wheat., 207; 3 Ency., 892; 2 Ves., Sr., 213; 1 T. Raym,

496; 17 Ohio St., 367; 1 Bradf., 495; 162 U. S., 439; 64 F. R., 59; 124 U. S., 465; 5 Biss., 166.

*Mr. T. Moultrie Mordecai,* special assistant U. S. attorney for South Carolina, contra, cites: *One-half must go back to treasury of United States:* 162 S. C., 464.

*Messrs. B. H. Rutledge, H. E. Young, Langdon Cheves* and *A. R. Young,* for statutory next of kin, contra, cite: *No presumption of marriage can arise between a white and colored person:* 63 S. C., 244; 37 S. C., 19. *Fund must go to next of kin, according to statute of distributions:* 162 U. S., 464.

July 14, 1904. The opinion of the Court was delivered by

MR. JUSTICE GARY. The facts of this case are fully set out in the report of the master, which, together with the exceptions to the decree of the Circuit Court, will be incorporated in the report of the case. The report of the master was confirmed by the Circuit Judge and ordered to stand as the judgment of that Court.

It was incumbent on the appellants to satisfy this Court that the findings of fact by the Circuit Court are not sustained by the preponderance of the evidence. The burden, therefore, rested upon them to show that the Circuit Court erred in finding that they are the illegitimate offspring of Adam Tunno. In this they have failed. They contend, however, that even if they are illegitimates, they are entitled to take as next of kin under the act of Congress. We regard this question as conclusively settled against the contention of the appellants by the case of *Flagge* v. *Balch,* 162 U. S., 439, as bastards do not take by inheritance under our statute of distributions.

This conclusion, which shows that the appellants have no interest in the fund, renders the other questions presented by the exceptions speculative, and, therefore, there is no necessity for considering them.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.