### 9822

TEDDER *ET AL.* v. TEDDER *ET AL.* (Two Cases).

(93 S. E. 19.)

1. MARRIAGE—ESSENTIALS—INTENT.—Where it is not claimed that there was a formal marriage in an instant of time, the difference between marriage and concubinage depends on whether the parties intend to live together according to law, and such intent, though usually evidenced by a public and unequivocal declaration, may rest in circumstances.

2. MARRIAGE—BURDEN OF PROOF.—Where the association between a white man and a woman having negro blood was immoral in its inception, the burden of proving a marriage was on those asserting it, even though at the time of the alleged marriage there was no law prohibiting the marriage of a white man to a colored woman, as there was a presumption of fact against such a marriage.

3. MARRIAGE—SUFFICIENCY OF EVIDENCE—REPUTATION.—Evidence as to reputation and cohabitation *held* insufficient to establish a marriage between a white man and a woman of negro blood, between whom it was not claimed that there was any formal marriage.

4. MARRIAGE—ESSENTIALS—LIVING TOGETHER.—Cohabitation, begun and continued immorally, does not ripen into marriage by lapse of time.

5. LIMITATION OF ACTIONS—ACCRUAL OF CAUSE OF ACTION—CANCELLATION OF DEEDS.—Under Civ. Code 1912, sec. 3454, providing that if any person having lawful children living shall convey by deed or

gift to any illegitimate child more than one-fourth of the clear value of his estate, the deed of gift shall be void in favor of the legitimate children for the excess over such one-fourth, though the deed is voidable, it gives no present cause of action to the lawful children, and limitations do not run against their right to set aside the deed until the death of the parent.

6. DEEDS—VALIDITY—SUFFICIENTCY OF EVIDENCE.—In a suit to cancel deeds from a man to his illegitimate children, evidence *held* insufficient to show mental incapacity or undue influence.

7. DEEDS—CANCELLATION—EFFECT OF FAILURE TO PERFORM CONDITION.— Where land was conveyed by a man to his children and a part of the consideration was the grantee's promise to pay off a mortgage, the grantee's failure to do so was not ground for canceling the deed.

8. BASTARDS—GIFTS FROM PARENT—BURDEN OF PROOF.—In a suit to cancel deeds from a man to his illegitimate children so far as they conveyed more than one-fourth of the grantor's estate, the moral duty of the grantor to provide for his legitimate children imposed on the grantees the burden of proving that they were purchasers for a valuable consideration, especially where one of the grantees lived in the same house with his aged father and looked after some of the father's business, and therefore sustained a fiduciary relation to the father.

9. BASTARDS—GIFTS FROM PARENT—SUFFICIENCY OF EVIDENCE.—In such suit evidence *held* insufficient to show the payment of a valuable consideration for the deeds by the grantees.

Before WILSON, J., Darlington, December, 1914. Modified.

Two actions by R. Furman Tedder and others against William Tedder, Jr., and others by R. Furman Tedder and others against Thomas Tedder, Jr., and others. From a decree for defendants, plaintiffs appeal.

*Messrs. Geo. W. Brown* and *F. A. Miller,* for appellants. *Mr. Brown* cites: *As to continuance of illicit relationship:* 2 Dow. 501; 9 S. C. Eq. (Rich. Eq. Cas.) 101; *Ib.* 109; 101 S. C. 45. *Miscegenation:* 13 Stats. 31 and 394; 17 Stats. 186; Civ. Code (1912), sec. 3757. *Grantor as witness to impeach deed:* 36 S. C. 385; 83 S. C. 337; 19 S. C. 477; 3 S. C. 577; 83 S. C. 338. *Consideration:* 35 S. C. 537; 41 S. C. 345; Civ. Code (1912), sec. 3454. *Burden to show bona fides on defendants:* 2 Pom. Eq. Juris. 955 to 959; 82 S. C.

199; 89 S. C. 268; 91 S. C. 487; 64 S. C. 404. *Fraud and undue influence:* 89 S. C. 268; 87 S. C. 1; 91 S. C. 487; 2 Pom. Eq. Juris., secs. 955 to 960.

*Mr. Miller* cites: *As to presumption of concubinage:* 69 S. C. 406; 63 S. C. 244; 9 S. C. Eq. 98 and 109; 101 S. C. 45; 16 Cyc. 1052; 57 Am. Rep. 448; 97 Am. Dec. 468. *Bastardy act:* Civ. Code (1912), sec. 3454; 17 S. C. Eq. (Speer's Eq.) 1; 64 S. C. 404. *Burden of proof:* 82 S. C. 206; 61 S. C. 501; 90 S. C. 196; 106 S. C. 328. *Assumption of mortgage debt:* 6 Pom. Eq. Juris. 686; 6 Cyc. 288; 28 L. R. A. (N. S.) 608; 101 Am. St. Rep. 243. *Failure of consideration:* 6 A. & E. Enc. of L. 789; 73 S. C. 125.

*Messrs. E. O. Woods* and *W. F. Dargan,* for respondents. *Mr. Woods* cites: *As to marriage:* 101 S. C. 40; 69 S. C. 412; 1 Bishop Marriage & Divorce, sec. 928; 68 S. C. 475; 90 S. C. 246. *Consideration for deeds:* 82 S. C. 207. *Limitations of action:* 73 S. C. 119. *Conditions subsequent:* 58 S. C. 125; 65 S. C. 256; 75 S. C. 432.

*Messrs. Dargan & Dargan* cite: *As to marriage:* 26 Cyc. 825, 836, 837, 872; 26 S. C. 273; 68 S. C. 404; Rich. Eq. Cas. 99. *Proof of bastardy:* 86 S. C. 248. *Declarations of grantor:* 9 Rich. L. 50; 16 Cyc. 987; 43 S. C. 372; 83 S. C. 337.

November 4, 1917.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

The cause is in equity to set aside sundry deeds to land, made in fraud of section 3454 of the Code of Laws. It involves some 300 acres of land situate near Society Hill, and said to be of the present value of some $20,000. There are, in fact, two actions, but they were tried together, and they come so here. The plaintiffs in the two actions, except S. W. Tedder, are the confessed lawful children and

grandchildren of William Tedder, Sr., by his wife,. Gemimah. The defendants, in the two actions, except Carrigan, are children and grandchildren of William Tedder, Sr., by a woman called Adeline, confessedly of negro blood, and their legitimacy is denied and affirmed. William Tedder, Sr., died in 1905, the actions were begun the next year thereafter, and they have just reached this Court, Gemimah, the confessed lawful wife of William, died in 1864 or 1865. Betwixt that period of time and 1870, the exact period is not certainly fixed, Adeline commenced to live with William, Sr., and their children were born after that period. Adeline had been a slave of Gemimah, and, as before stated, she was confessedly of mixed negro blood. Adeline died "about 18 years ago," one of the witnesses said. Though the testimony does not fix in what calendar year the death occurred, it must have been about 1890, after 20 years' cohabitation with William. Betwixt the years 1888 and 1905, William, Sr., conveyed by deed the lands in issue, in sundry parcels, to his four sons, William, Jr., Samuel, James and Gus. · To several of William's children by Adeline he made no conveyance of any part of his land. The children by Gemimah got none. By the said conveyances William, Jr., got in four parcels and by two deeds 170 acres; Sam got 45 acres; James got 30 acres, and Gus got in two parcels and by two deeds 81 acres—all told 326 acres. The first action is brought under section 3454 of the Code of Laws; and the plaintiffs seek thereunder to vacate the said several deeds: (1) Because there was no consideration paid for them; and (2) because the aforementioned grantees are alleged to be the bastard children of William, Sr., by Adeline, and the conveyance to them was voidable under the statute, except to the extent of one-fourth of the value of the property. The second action assails the aforementioned deeds by William, Sr., to William, Jr., upon the ground that they were obtained by the son from the father through the fraud, misrepresentation, and imposition of the son upon the father.

The master, without discussion, found all the issues for the defendants in both cases, and recommended a dismissal of the complaints. The Circuit Court, in formal orders, confirmed the reports of the master.

There are 15 exceptions by the plaintiffs in the first case, and 5 exceptions by the plaintiffs in the second case. These we shall not take up in order; but we shall mayhap compass all the determinative issues in the case. We think they are these, and we state them in dependent order, to wit: (1) Were William and Adeline husband and wife when their children were born? (2) Is the action against James and Gus barred by the statute of limitations? (3) Was the deed from William, Sr., to William, Jr., procured to be made by the fraud of the grantee? (4) Should the deeds be canceled for the nonperformance of the condition upon which they were given, to wit, the sons' promise to pay the Carrigan mortgage? (5) Did William, Jr., and Sam pay a valuable consideration for the deeds they got? There are exceptions to the disallowance of testimony tendered by the plaintiff; but the issues they make are secondary, and we think not necessary to a right decision of the cause.

The dominating question in the case is the first stated. We are distinctly satisfied that upon that question the master and Circuit Judge have arrived at a wrong conclusion. We are mindful, too, of the law that the burden is upon the plaintiffs at the outstart to prove by a preponderance of the testimony that William and Adeline were not husband and wife. The counsel for the defendants have not asserted that there was a formal marriage in an instant of time; all they assert is that the circumstances prove that the marriage relationship existed in some time. One of the counsel cites seven such circumstances, to wit:

"That William Tedder, Sr., held out Adeline as his wife to McMillan and to Thos. H. Coker and T. H. Sompayrac; that he lived with her as his wife; that they enjoyed the same habitation and the same board; that they reared the

same children together under the same name, and in the same household and as his family; that he treated Adeline as his wife, and she treated him as her husband; that the children were treated as members of the family as a unit; that they lived there many years as husband and wife, in sickness and health, until death parted them."

But most of these circumstances might surround an immoral cohabitation.

The difference between marriage and concubinage in the circumstances stated rests in the intent of the cohabiting parties; the physical and temporal accompaniments of the cohabitation may be the same in both cases, but the intent in the two cases is widely apart always. The intent in marriage is usually evidenced by a public and unequivocal declaration of the parties, but that is not necessary; the intent may exist though never public and formally declared; nevertheless the intent must exist. The intent in marriage consists of living together by agreement of a man and woman as husband and wife according to what we know to be the law of the land, and according to what we believe to be the law of God. The intent in concubinage consists in a man and woman living together in the contrary fashion. It is true that when the intent has not been formally and publicly declared, as it manifestly was not in the instant case, it may yet rest in circumstances. See *Fryer v. Fryer,* 9 S. C. Eq. (Rich. Eq. Cas.) 98; *Stringfellow v. Scott,* 9 S. C. Eq. (Rich. Eq. Cas.) 109, note; *Lucken v. Wichman,* 5 S. C. 413; *Blackburn v. Crawford,* 3 Wall. 195, 18 L. Ed. 186; 2 Kent (14th ed.) bottom page 120, note.

There are two circumstances which, when established by the testimony, shift to the defendants the burden of proving that William and Adeline were husband and wife. They are: (1) The negro blood of the woman; and (2) the immoral inception of the association. It may be, as the respondents contend, that the law of the State did not prohibit the marriage of a white man to a col-

ored woman at the particular period of time when the cohabitation began. But though that be true, yet the presumption of fact was then, and is now, that a white man will not marry a colored woman. That is true because the common and unbroken practice of our society since the foundation of the State has been against such alliance. See *Lloyd v. Rawl,* 63 S. C. 244, 41 S. E. 312; *Rutledge v. Tunno,* 69 S. C. 406, 48 S. E. 297; 2 Kent (14th ed.) note, bottom page 379. This presumption of fact, then, standing against a marriage, the burden is shifted on those who allege a marriage to prove it. But when all the testimony is in, upon the trial of an equity case, the somewhat technical question of the burden of proof fades away, and the issue turns upon the real question of the preponderance of the testimony, still giving due weight to the presumption.

Considering now the whole testimony on the one side and on the other side, we are satisfied that the circumstances prove that the relationship betwixt William and Adeline was immoral. The respondents say, and strongly rely on the circumstances, that the persons called themselves husband and wife, and that they cohabited as man and wife. "The parties might call each other husband and wife, as a sacrifice to decency, and treat each other as such; it being well known to themselves, and to every one else, that they did not consider each other as standing in that relation." Harper, Chancellor, in *Stringfellow v. Scott,* 9 S. C. Eq. (Rich. Eq.) Cas., p. 112, note.

The reputable witnesses of the neighborhood, who testified about the relationship of the parties, did so in restrained language.

Mr. Carrigan, of Society Hill, testified he had "heard it both ways;" that is, that William and Adeline were married, and that they were not married.

Mr. J. S. Coker testified that the general reputation or common rumor in the community, in regard to Adeline's children, was that they were illegitimate.

Mr. H. J. Coker testified that Adeline began to live with William shortly after the war, and "it was the general talk in the community that they lived together just like a man and wife."

Mr. T. H. Coker, Sr., testified that William made him a deed, and that Adeline renounced dower on it; and, when the witness was asked who was present at the signing of the deed, he answered: "Old man William and Adeline Tedder, his wife, as they called her then. I don't know, I couldn't tell."

Mr. C. H. Powe testified that he "had known old man Tedder ever since he had known anybody; had heard of Adeline, but had never seen her; that it was common report that she was living with Tedder."

On cross-examination by the defendants the witness testified as follows: "Q. When is the first time you remember of this woman, Adeline, living in the house with old man Tedder? A. I never did see her; I only heard about it. Q. It was a common report that she was living there with him, wasn't it? A. Yes, sir. Q. All the time? A. Yes, sir. Q. Continuously and notoriously? A. Yes, sir. Q. And that these children were living there? A. I can't answer that. I only passed along the road. ·I suppose it was these defendants. Q. Just like the family? A. I suppose so. Q. And as Mr. Coker says, living there just as husband and wife? A. I suppose so."

James Moody once lived in the house with the old man, and Adeline did not then live there. After Moody moved out Adeline moved in and lived there until her death. On the cross-examination by the defendants, the witness testified as follows: "Q. I understood you to say that she lived there right straight on until she died? A. She did. Q. You mean, then, that she continued to live in the house there with the old man just as husband and wife would live up to the time of her death? A. Yes, sir." .

A witness for the defendants named McMillan, and of questionable antecedents, testified that he once passed Tedder in a wagon with a colored woman whom he called his wife, and that Tedder pointed out the woman to verify it.

These are all the witnesses whom the defendants rely upon to prove marriage. The testimony is utterly insufficient to establish the fact.

There is no semblance of direct testimony to prove, and there is no serious assertion by the defendants, that in any instant of time William and Adeline agreed to be man and wife with the intent to be such. The whole trend of the testimony is, that in its inception the cohabitation was immoral, and there is not sufficient proof that it was ever changed. Cohabitation, begun and continued immorally, does not ripen into marriage by the mere lapse of time, like a trespass long continued may ripen in a right of possession. Had William and Adeline been husband and wife for the 20 years in which they lived together, in a community like that in which they resided, the fact of their marriage would have been known to the country side. The first issue, therefore, must go against the defendants, and for a reversal of the judgment of the Circuit Court. The deeds, therefore, made to the offsprings of this unlawful cohabitation, are voidable except to the extent of one-fourth of the value of the estate granted, unless the grantees paid for the same; and that is the issue we have set down to last consider.

The sons and grantees, Gus and James, seek to escape liability by force of the statute of limitations. They got their deeds many more than 6 years before the grantor, old William, died, and before action brought. They assert that the plaintiffs' action is, therefore, barred by the statute (section 137, Code).

Reliance is had upon *Williams v. Halford,* decided at 73 S. C. 126, 53 S. E. 90. It is true that it was there expressly held: (1) That the Circuit Court in that case erred to hold

that the lawful children had no cause of action until the grantor was dead; and (2) that the Circuit Court in that case also erred to hold that a vacation of the deed in the grantor's lifetime would operate to revest in the grantor three-fourths of the estate so granted. This Court also held in that case as follows: "If, also, it be true that the title of the illegitimate is good and perfect, subject only to this personal equity in favor of the lawful wife and children, it must follow that if relief under the statute is obtained during the lifetime of the husband, he takes nothing thereby, since, so far as he is concerned, he has parted with his interest in the property."

But in the Williams-Halford case the grantor was dead when the action was brought. The conclusion of the Court was, therefore, not had upon the facts, and was, therefore, but a dictum, and two of the four Judges did not concur in it. The case, therefore, has little, if any, authority. Nevertheless we should be, and are, slow to question a dictum, even in a well considered judgment. We have given considerate attention to the preceding opinions of this Court, cited at some lengths in *Williams v. Halford,* and upon which the opinion in that case professes to be founded; and there is nothing in them hostile to the settled conclusions we have reached and now announce.

The question at issue is this: When did a cause of action against Gus and James accrue to the plaintiffs, at the instant of making of the deeds to Gus and James, or at the grantor's death? That depends upon a construction of section 3454 of the Code of Laws, for that statute creates the right of the plaintiffs. Using only such words of the statute as are relevant to the facts of this case, the statute runs as follows:

"If any person * * * who shall have already begotten * * * any bastard child * * * the said person * * * having * * * lawful children of his own living, and shall * * * convey * * * by deed of gift, * * * for the use and benefit * * * of his bastard child * * * any larger

* * * proportion of the real clear value of his estate * * * than one-fourth part thereof, *such deed of gift * * * shall be null and void,* only in favor of * * * legitimate children, for so much of the amount or value thereof as *shall * * * exceed such one-fourth.*" (The italics are supplied.)

The statute does not so expressly declare, but the necessary implication of it is, that for so much as one-fourth of the property granted the deed shall be good to the bastard. The statute does expressly declare that the deed shall be void to the bastard for all over the value of one-fourth of the property granted. But the statute does not declare, nor does it necessarily imply, that the three-fourths shall, at the instant of the deed, vest in the lawful children. On the contrary, the statute declares that as to that three-fourths the deed is voidable; that is to say, the same as if it had not been made for that three-fourths. Manifestly, the parent had the right to convey one-fourth to his bastard child and keep the three-fourths for himself. The case is not altered that the parent did convey one-fourth to the bastard and made a vain effort to convey away the three-fourths, too. It is true that at the instant old William made the deeds to Gus and James he violated the law; but that fact did not give grievance (a cause of action) to the lawful children under the statute, because that fact did not impair their present right to have the land, for the statute gave them no such present right. The lawful child might have died before the parent, and in that event his inchoate action, so to speak, would have died with him; the deed of the whole to the bastard would be good. We conclude, therefore, that the plaintiffs' action against Gus and James is intact and not barred by the statute of limitations, and in this respect the judgment below is wrong.

The third issue, we are persuaded, was rightly decided, and the judgment thereabout must be affirmed. The deed

from the old man to William was prepared by Mr. Somparac, and the two doctors who witnessed it were called to do so, not on the son's motion, but by Mr. Sompayrac's suggestion. One of them was the old man's family doctor. Dr. Carrigan testified that the old man signed the deed sitting in a chair, and that he was then rational. "There was no stupid condition of mind to cause him to not know what he was doing" are the witness' words. Dr. Barrentine testified that the old man was weak and emaciated, and had some fever at the signing, but he also said the old man's mental condition was clear. Indeed, the old man *intended to do* the thing the bastardy statute declares he could not lawfully do; the whole theory of the plaintiff's case, under the bastardy statute, is that the old man intended to make the deed to his bastard children. We think, therefore, that there is no proof that the old man was unduly influenced to make the deed, and that he was mentally incapable of making it; that it is the gravamen of the complaint. He did that which he intended to do, and which we have held was a violation of law; if the deed was a gift.

We come now to the fourth question. It is doubtful if the complaint makes the question. But if A should convey to B a parcel of land, upon consideration of B's promise to lift a mortgage debt which A had aforetime put on it, then B's failure to pay would be no ground for A or his assigns to have the deed canceled. *Lavender v. Daniel,* 58 S. C. 125, 36 S. E. 546. If, therefore, old William made to his son a deed, and if a part of the consideration for it was the son's promise to pay off the mortgage debt the old man had made to Carrigan, then the failure of the son to do so would not be any ground to cancel the deed.

On the fifth and last issue we are clearly persuaded that the decree below is contrary to the plain weight of the evi-

dence. If the four sons who got deeds from old William were his children begotten in wedlock, then there was no necessity for them to claim as purchasers for a valuable consideration. On the other hand, the fact of their illegitimacy was a sufficient temptation and excuse for them to claim to be purchasers. The burden rested on the defendants to prove themselves purchasers, for two reasons. They are these: (1) The moral duty of the father was to provide for his legitimate children. When he failed to do that and conveyed all his land to his bastard children, the act thereby wore a badge of fraud which the beneficiaries ought to remove. (2) The son, William, sustained a fiduciary relation to the father. The father was 81 years old when the deed of 1905 to William, Jr., was made. He was then very feeble and died within 90 days. The son lived in the same house with the father. The son, William, testified: "He seemed to look on me to see after his business in some respect. Some of it, not all."

These circumstances cast upon the son the duty to prove the transaction to be a genuine one. *Way v. Ins. Co.,* 61 S. C. 501, 39 S. E. 742. But, as before stated, these presumptions fade away and become of no consequence when the whole testimony is in. The son, William, got by two deeds four parcels, aggregating 170 acres, and for the expressed consideration of $2,100. The testimony tending to prove payment by William, Jr., is vague and unsatisfactory; it does not carry conviction; it suggests evasion, concealment, and deceit. Within the space of a page of the printed testimony of William, he swore on the cross-examination 13 times that he did not remember incidents which ought under the circumstances to have been familiar to him. The testimony is full that the land he got was at the time he got it worth double what he claims to have paid for it. There is no testimony which is worth while to prove that William paid the $1,600 expressed as the consideration for the 120 acres conveyed to him by the

old man in 1905. This is the witness' account of that transaction: "Q. Deed dated 11th of March, 1905, on 65 acres and 40 acres and 15 acres. I see this deed of March 11, 1905, is for $1,600, is it not? A. Yes, sir. Q. Did you pay that to him? A. No, sir; I did not pay him. Let me explain it. Q. Did you pay him $1,600? A. I paid it in this way. He owed me $300 and $412, what we counted it up to be for that mortgage. Q. He owed you $300? A. Yes, sir. Q. For what? A. He owed me $300 for labor. There was 2 years' work he owed me for at $150 a year, myself and horse. I furnished the horse myself, and he furnished the feed for the horse and for me, too. Q. Then you paid him $712 in this way? How about the balance of the $1,600? A. Well, you see there was a mortgage on this property, and he did not know how much the mortgage was, and I was not able to find out how much it was. Anyway, we supposed the whole thing to be $1,600, including what he owed me and the mortgage, too."

Being called again, the witness further testified: "Q. I hand witness a deed of date 11th day of March, 1905, from William Tedder, Jr. Did you pay for this land, William? A. Yes, sir. (Deed introduced in evidence.) Q. How did you pay, William, and what did you pay? A. $1,600 was the understanding, but I had a right smart more to pay before I got through. Q. What was your first payment to the old man? A. $300. Q. Next? A. Next we estimated to be $412. That was the value of that mortgage, and he owed me that money at that time. Q. He owed you that money at that time? A. Yes, sir. Q. And the balance you estimated to be about $900? A. Yes, sir. Q. How was that to be applied? A. That was to make the $1,600. Q. You estimated the mortgage debt to amount to $900? A. Yes, sir. Q. You bought the land subject to $900? A. Yes, sir."

The testimony of William, Jr., about the 50-acre tract, and the payment for it, is equally unsatisfactory; about that

he testified as follows: "Q. I hand witness deed dated February 13, 1903, for 50 acres of land. Did you pay him for that land? A. Yes, sir. Q. How? A. I paid it in money. Q. How many installments? A. Three. Q. Did you get receipts? A. I got two receipts. Q. What became of them? A. I don't know. I could not say what became of the receipts. I kept them until after I got title, and since they have gotten lost. Q. Have you made search for them? A. Yes, sir; since this suit came up I have looked for them, but cannot find them. They must have gotten misplaced in some way. Q. At the time you bought this land was there a mortgage on it? A. Yes, sir. Q. Who was to pay it? A. He was to pay it. Q. Did he do it? A. No, sir. (Mortgage of William Tedder, Sr., to Albert Richardson, of date March 5, 1894.) Q. Who did you pay that mortgage to? A. Mr. George Dargan. Q. And you paid $500 for that 50 acres of land? A. Yes, sir."

About the possession and cultivation of that parcel the witness said: "Q. When did you come into possession of that 50 acres? A. I was in possession of it when I bought it, 1901. I could not say I had possession of the whole thing. I had the privilege of it, but did not cultivate all. Q. Why? A. It was not surveyed. I just planted what I wanted. Q. Who planted the other part? A. The old man, I reckon, planted the other part. J. D. Tedder planted some. I planted on the side the 50 acres come on."

The tax returns of William from 1900 to 1905 show that he had practically no property in those years. There is no proof that he was a man of thrift.

The evidence of a *bona fide* promise to pay the Carrigan mortgage as part of the consideration is altogether unsatisfactory. Mr. Parrott testified that William, Jr., told him that he (William) was to take up the mortgage, and that was the consideration of the deed from old William. William, Jr., admitted on the witness stand that when he saw Mr. Parrott he did not know the amount of the mortgage. And

in his testimony before quoted he said he "was not able to find out how much it was." And the fact is, William never paid the Carrigan mortgage. The son, Sam, got 45 acres, in 1902, for an expressed consideration of $450. Sam worked with the old man, and was fed and clothed by him. He does not pretend to have paid the father any money for the land; he testified he paid in labor. On direct examination this is all the witness said about the payment: "Q. This is your deed, Sam (showing paper)? You have seen that before? A. Sure. Yes, sir. That is mine. Q. It says $450? A. Yes, sir. Q. Forty-five acres of land? Well did you pay for that land? A. Yes, sir; I paid for it."

The brevity of it is significant.

The cross-examination utterly discredited the witness; here is a sample of it, and it is much like the whole of it: "Q. When did you come into possession of that land? A. I come into possession of it, a part of it— Mr. Dargan: State when. The Witness: I come into possession of a part of it in about 1904. Q. How much of it? A. Well, a few acres. Q. How many? A. A few acres, as many as I wanted to tend. Q. How many? I don't know how many you could tend. A. Just a few acres. Q. Tell me how many. I don't understand what you mean. A. Well, about 6 or 8. Q. In 1904 you came into possession of about 6 or 8 acres? A. Yes, sir; as much as I wanted to tend. Q. You didn't want to tend any of it, did you? A. Well, it was mine. Q. When was that you said you came into possession of this 6 or 8 acres, 1904? A. Yes, sir. Q. At that time how much did you owe on this land? The Master: At that time how much did you owe on that land? O. At that time how much did you owe on this land? A. You mean did I owe on it? Q. Yes. (No answer.) Q. Well, I will wait on you. (No answer.) Mr. Dargan: Tell him how much you owed. The Witness: Well, I owed about $150. Q. And you were in possession of this 6 or 8 acres? A. Something like that. Q. It might have been more than

$150, might it? A. Well, I don't think so. Q. Why did you say about? Why did you say about? You can't tell me.. A. Well, I can tell you. Mr. Dargan: Well, tell him. The Witness: What did you say at first? Q. What did I ask you? A. I forget."

There is no other witness to prove payment by Sam, and his own testimony falls far short of such proof. But the respondents say: "The deeds themselves assert the consideration. William Tedder testified he paid a consideration for the deed."

The same circumstances accompany well-nigh every unlawful transaction; and if Courts had to take the word of the written instruments and the testimony of accused parties as conclusive of the issues, wrong would never be disclosed. Men circumstanced like William and Sam ought to have been able to give a clear, particular and convincing account of how they got well-nigh all the land the old man had, and to which they had no right as his children.

The conclusion we reach is that the deeds to William and Sam and to James and Gus are voidable to the extent of three-fourths of the value of the land, and the decree below is reversed as to those matters, and that the decree is affirmed so far as the action to set aside the deed from William, Sr., to William, Jr., for a fraud upon the father.

Let the cause be remanded to carry out the views we have expressed.