127 P.2d 1037

MORGAN v. THOMPSON et al.
No. 4660.

Supreme Court of New Mexico.

May 22, 1942.

Rehearing Denied Aug. 11, 1942.

Mears & Mears, of Portales, for appellants.

Harold O. Gore and R. E. Rowells, both of Clovis, for appellee.

BRICE, Chief Justice.

This action was brought by appellee to cancel deeds executed by him conveying to appellants 720 and 480 acres of land, respectively. During the progress of the trial the 480 acres were reconveyed to appellee. The controversy is over the deed conveying the 720 acres.

The court concluded that the deed should be cancelled because (1) the appellee was mentally incompetent to make a deed at the time he executed the one conveying to appellants the 720 acres; and, (2) that the conveyance was made without consideration.

Prior to February 9, 1939, the appellee, who was a bachelor and an uncle of appellant Pauline Thompson, owned the two tracts of land mentioned. The appellants are husband and wife. At the time of the conveyance of the 720-acre tract the appellant was 73 years old, in poor health, suffering from asthma, high blood pressure, rupture and hay fever, and was unable physically to look after his affairs and attend to his business. The land was mortgaged to the Federal Land Bank to secure a debt of $3,366.92, of which there were past due installments of principal and interest of about $200. The appellee owed an indebtedness of $300 past due, secured by a mortgage on the 480 acres and another mortgage debt in the principal sum of $1,324.30 on 160 acres of this 480 acres.

The appellee, without any solicitation on the part of the appellants, offered to convey to them the 720-acre tract. The appellants first refused to accept it, but finally agreed to accept a deed, the consideration for which is in dispute.

The appellee's personal property was sold and a part of the proceeds was received by the appellants. The land was rented and appellee moved to the town of Melrose. The appellants made no false representations to secure the conveyance, nor were they solicitous to have the land conveyed to them. In fact they accepted the deed reluctantly and only because of the insistance of appellee.

Appellants received from the sale of appellee's personal property and rent $1,112.34, and paid out on debts, accounts, interest and taxes the sum of $823.10, leaving a balance in excess of that paid out, of $289.24 in appellants' hands, belonging to appellee.

The court concluded that there was no consideration for the conveyance because the above facts showed that the appellants had paid the appellee's debts with his own money.

The first question is whether there was any consideration for the conveyance. The material testimony on this question is as follows:

Appellant W. E. Thompson, who acted for appellants in the transaction, testified:

"So I told him (appellee): If you know that is what you want to do and you know you are going to lose the place, and you want Pauline to have it, which was my wife, I said, we will take the place. I said, I will pay the Federal payments on the 720 acres and I will pay the taxes on it, and I will also pay all of your taxes, your personal taxes and your land taxes on the rest of it, but I have not got enough money to pay the Federal loan on the Herbert Morgan place, but I said, you are going to have enough to pay that and with what you will get out of the other stuff

around here you can make it all right. So that was the agreement.

"Q. Did you offer to pay the taxes on the other lands and his personal taxes over and above what he asked you to do? A. Yes, sir."

The testimony of appellee was rather incoherent, a part of which is as follows:

"Q. Now, what was said at that time, by whom, and what was the offer they made to you or that you made to them? A. Well, I wanted to get the business so I could get some ease, and I requested that in the transfer of this that there be an oil lease mentioned. * * *

"Q. What did they say at the time they would do for you if you deeded that land to them? A. They would help me to straighten up my business, get my debts paid, and take charge of my business.

"Q. And what was to be done—did they say what was to be done with the deeds you were making at that time? A. I thought they was going to hold them in escrow.

"Q. What did they say they would do? A. Well, it seems like that they went ahead and recorded the deeds. * * * Well, it seemed like they was to hold it in escrow. * * * Well, at that time it seemed—I was in very poor health, you know, and come pretty near dying several times out there, my heart was badly affected.

"Q. All right; did they say anything about taking care of you and keeping you, up there? A. They said they would take care of me.

"Q. And did they say anything with regard to paying off the indebtedness against your place? A. Well, it was understood; that is they was to straighten up all of this indebtedness, you know.

"The Court: I understand, but what did they say, Mr. Morgan? The Court will pass on what was understood; whether it was understood or not. A. They said they would do that.

"Q. You are positive they said they would do that? A. Yes.

"Q. Now, at that time did you have a loan on a piece of your land to a man by the name of Burdick; was that particular loan mentioned in your conversation? A. Yes.

"Q. What did they say they would do about that? A. That they would take care of that. I wanted it transferred back to where it belonged, to the 720 acres of land.

"Q. What was the amount of that particular loan? A. Well, at that time I think it was around $1400. * * * Mr. Thompson said he would take charge of the place and help me to wind up the business and help to meet the obligations, and it just slips my memory how the words were. * * * Yes, he said they would take care of me. * * *

"Q. (by Mr. Gore). All right, now what did you say you would do for them in exchange, after they said they would

take care of you, what did you say you would do? A. That I would let them have that place, the 720 acres.

"Q. You said you would let them have it? A. Yes.

"Q. Outright? A. Well, they was to take care of these debts you know.

"Q. Yes? A. And the arrangement was that I was to have food and raiment, and I didn't understand that it was to come from my individual money all the time, because the land was worth more than that, and my judgment was that they was to allow me something on this land that I had been out.

"Q. (by Mr. Gore): Go ahead: It seemed there was an agreement there? A. That they was to do this. But it blurs with me now, that they was to use all my money to look after me. They left me without any money to draw on for anything except what they saw fit to let me have."

The trial court found that the two tracts of land "taken as a whole" were worth about $8 an acre. No separate value was placed on the 720 acres. It appears that 160 acres of this land were not very valuable, but we have no way of determining its value separate from the other lands, and will assume that the 720 acres were worth $5,760.

The court's findings Nos. 3 and 6 are as follows:

"The Court further finds that along in the fall of 1938 he first wrote to his niece, Mrs. Painter, proposing that he convey the 720 acres to her or her husband if they would help him out, pay his debts, take charge of his business, etc. The Painters refused. Then he took the matter up with the defendants, making them substantially the same offer; that the defendants visited him on his ranch in Roosevelt County, that his brother visited him and I think possibly the Painters. Plaintiff kept insisting that he wanted to convey this 720 acres to them. Letters were introduced in evidence which indicated that the plaintiff was very much agitated over his affairs, and was nothing short of hysterical. He appeared to be obsessed with the idea that he just wanted to get rid of the stuff. Finally it was agreed by the defendants that they would accept the offer, although, at first they refused. I gather from the testimony that it was the agreement that they would discharge his indebtedness in consideration for this deed. A lot of his personal property was sold and some money realized from this, which he eventually turned over to the defendants. The defendants rented the property and in August moved him to the town of Melrose The court finds in connection with this transfer that because of the condition of his health, senility and worry, the plaintiff was mentally incompetent, and, in the light of what the Court will hereinafter point out, no consideration whatever moved from the defendants to the plaintiff." (Finding No. 3)

"The Court further finds that from time to time as plaintiff's cattle were sold and

as he sold his grain, money was turned over to the defendants. A strict account has been kept of this money. According to the defendants' testimony, they had received in cash from the plaintiff the sum of $982.34, and that they had paid out on these various accounts, interest, taxes, etc., $823.10. In other words, they had received $159.24 more than they had paid out on all accounts for the plaintiff. Besides this, they had received on account of the sale of crops a new amount of about $130.00. This would mean the defendants got about $289.24. In other words, there is no evidence that they had been out anything, and they now hold title to the land. This is what impels the Court to hold that there was a total want of consideration. They stated that it was their duty to pay his debts. This they have done in a measure, but have paid the plaintiff's debts with his own money." (Finding No. 6)

A part of Finding No. 5 is as follows: "I do not find that defendants made any false representations as to the conveyance of the 720 acres. I do not find that they were solicitous. As a matter of fact, they apparently accepted the deed reluctantly, .but, as before stated, the plaintiff was so insistent on getting somebody—anybody to take the title to this land. * * *"

If we correctly appraise these findings of the court they are to the effect that the appellants agreed to pay all of appellee's debts in consideration of the conveyance to them of the 720 acres.

It is apparent from the statements of the two parties and the findings of the court that there was in fact a consideration for the conveyance. If the appellants' evidence reflects the terms of the contract then they performed it up to the time of trial in paying the installments upon the Federal Land Bank loan and the taxes due by appellee, including that upon his personal property. If the appellee's testimony and the findings of the court regarding the terms of the contract are correct, it appears that the consideration was equal to, or exceeded, the value of the land. The trial court's conclusion that because the appellants had not performed their contract but had charged appellee with the amount of money they had paid out upon his debts rendered the contract void because of the want of consideration, is error. A mere breach of the contract, without a provision therein for its termination upon such breach, does not authorize its cancellation. Beach v. Williamson, 78 Fla. 611, 83 So. 860, 9 A.L.R. 1438; 9 A.J. "Cancellation of Instruments" § 28. We conclude that if the appellants did fail to carry out their agreement to pay in futuro the appellee's debts, that failure did not in itself render the contract void for want, or failure of consideration. Tedder v. Tedder, 108 S.C. 271, 94 S.E. 19, 2 A.L.R. 438; Dorr v. Chesapeake & Ohio R. Co., 78 W.Va. 150, 88 S.E. 666, L.R.A. 1916E, 622; 9 A.J. "Cancellation of Instruments" §§ 25 and 28.

No attempt was made by counsel to state the indebtedness of appellee at the date

the deeds were made, but from the very unsatisfactory record we have examined, these items aggregate approximately $5,800.

If the appellee's testimony and the findings of the court reflect the facts (and we must so consider them if supported by substantial evidence) then the consideration appellants contracted to pay was equal to or in excess of the value of the land. On the other hand, if the actual consideration was that testified to by the appellants and their witnesses, the value of the land exceeded the consideration agreed to be paid, by something like $2,200.

While the testimony was not very satisfactory upon which the court based its finding regarding the consideration, we find enough in it to substantially support the finding.

That appellee was not insane, or not mentally incompetent, is so conclusively shown by his evidence and that of others, that of it there can be no question, and we will not review it. That appellee was mentally weak there can be no question and as the trial court found, it resulted from sickness, age, and other causes. But he was able to, and did, comprehend the nature and effect of the transaction. He understood exactly what he was doing, and there is no testimony on his part that would indicate otherwise. The only conflict is the question of consideration. If his testimony is correct, he had not lost his cunning as a trader.

Appellee was not insane, and though mentally weak, he understood the nature and effect of the transaction into which he entered. Standing alone his mental weakness is not sufficient to authorize the cancellation of his deed. Ravany et al. v. Equitable Life Assurance Society, 26 N.M. 514, 515, 194 P. 873; Kaleb v. Modern Woodmen of America, 51 Wyo. 116, 64 P.2d 605; In re Nightingale's Estate, 182 S.C. 527, 189 S.E. 890; Fleming v. Consolidated Motor Sales Co., 74 Mont. 245, 240 P. 376; Hayward v. Passaic Nat'l Bank & Trust Co., 120 N.J.Eq. 512, 186 A. 728; 17 C.J.S., Contracts, § 133.

We think the finding of the court to the effect that because of ill health, senility and worry the appellee was mentally incompetent to make a contract, is unsupported by substantial testimony and should be set aside.

That the appellee's mind was weak from ill health and worry we have no doubt. The rule regarding mental weakness is stated by a high authority, as follows:

"It is well settled that there may be a condition of extreme mental weakness and loss of memory, either congenital, or resulting from old age, sickness, or other cause, and not being either idiocy or lunacy, which will, without any other incidents or accompanying circumstances, of itself destroy the person's testamentary capacity, and a fortiori be ground for de-

feating or setting aside his agreements and conveyances. It is equally certain that mere weak-mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance. If, as is frequently if not generally the case, the mental weakness and failure of memory are accompanied by other inequitable incidents, and are taken undue advantage of through their means, equity not only may but will interpose with defensive or affirmative relief. Finally, in a case of real mental weakness, a presumption arises against the validity of the transaction, and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party." 2 Pom.Eq.Jurisprudence, § 947.

In a note to the above text it is said: "Where mental weakness, not of itself sufficient to destroy capacity, is accompanied by undue influence, inadequacy of price, taking advantage of pecuniary necessities, ignorance and want of advice, misrepresentations or concealments, and the like, a contract or conveyance procured by their combined means will be defeated or set aside; it is not a simple presumption of invalidity which thus arises, but the presumption has become established.

Of course, in the vast majority of instances, the mental weakness is wrought upon through such inequitable instrumentalities, in order to obtain a contract or conveyance for an inadequate consideration."

We held in Ravany v. Equitable Life Assurance Society, supra, that mental weakness, whether resulting from sickness, age or any other cause which does not totally destroy one's ability to understand the nature and effect of a contract, furnishes no ground for its avoidance in the absence of evidence showing fraud, duress or undue influence. See also the following: Douglas v. Ogle, 80 Fla. 42, 85 So. 243; Utterback v. Hollingsworth, 208 Iowa 300, 225 N.W. 419; Hinkley v. Wynkoop, 305 Ill. 115, 137 N.E. 154; Barnett v. Gross, 91 Okl. 162, 216 P. 153; Carrillo v. Murray & Layne Co., 25 Ariz. 303, 216 P. 689.

In this case the consideration was adequate, there was neither fraud nor undue influence or any other inequitable conduct on the part of the appellants that brought about the execution of the deeds, and the trial court so found. The findings of the trial court regarding the consideration are supported by substantial evidence. From them it would seem that appellants owe the appellee approximately $2300 of the consideration, also, for the appellee's funds used in paying such debts, amounting to several hundred dollars.

The findings that the appellee was incompetent to make a valid contract and

that the deeds were executed without consideration are cancelled.

The appellee's remedy is an action at law; or, in the discretion of the trial court, an equitable lien may be impressed upon the 720 acres of land to secure the unpaid consideration and the repayment to appellee for his funds wrongfully used by appellants to pay the debts they had agreed to pay by the terms of the contract. 33 A.J. "Liens" § 22.

The cause should be reversed and remanded with instructions to enter a decree for appellants, and to otherwise dispose of the case not inconsistent herewith.

It is so ordered.

ZINN, SADLER, MABRY, and BICKLEY, JJ., concur.